STEWART & STEVENSON SERVICES, INC., Ohmstede, Inc., and Ohmstede Mechanical Services, Inc., Appellants,

v.

SERV–TECH, INC., Appellee.

No. C14–92–01346–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 21, 1994.

Rehearing Denied June 16, 1994.

Jess H. Hall, Jr., Jeffrey Tayon, James R. Snell, Murray Fogler, Houston, for appellants.

John O'Quinn, Andrew M. Caplan, Marc Delflache, Brendan D. Cook, Houston, for appellee.

Before MURPHY, ROBERTSON and DRAUGHN, JJ.

## OPINION

ROBERTSON, Justice.

This appeal is from a judgment for appellee, plaintiff in the trial court, on its claim of "misappropriation of confidential, trade secret and/or technical information" for a total sum of $17,500,000 which included $5,000,000 in attorney fees awarded against Stewart and Stevenson only. Each appellant has filed it's own brief; Stewart and Stevenson (S & S) brings a total of twelve points of error; Ohmstede, Inc. (Ohmstede) brings six points, and Ohmstede Mechanical Services, Inc. (OMSI) brings five points. The controlling issues are whether there is a cause of action for misappropriation of confidential information, whether global submission of separate damage claims was error, whether an award of attorneys fees based upon a percentage of the total recovery for causes of action for both breach of contract and tort was proper, sufficiency of evidence to support the finding of alter ego, and sufficiency of evidence to support trade secret misappropriation. We reverse.

Serv–Tech, Inc. (Serv–Tech) had been in the business of providing on-site heat exchanger cleaning services for refineries and petrochemical plants for a number of years. Ohmstede had been in the heat exchanger repair and cleaning business for years, but most of its work was done in their shops located in various places, rather than on-site. OMSI, as will be more fully developed later on, was a new-comer to the same field in 1989. A portion of S & S's business includes the design, development and manufacturing of equipment for use in the oil, gas and petrochemical industry.

In 1984, Serv–Tech employed S & S to help build a "Fast Clean" machine, a revolutionary piece of machinery because it was totally integrated and the truck-mounted unit featured a remote-controlled cleaning boom-arm with an eight-lance cleaning device, which was used to clean the tube bundles in the heat exchangers in refineries and petrochemical plants. The first unit, a prototype, minus the cleaning boom arm was delivered to Serv–Tech in the first part of February 1985 and by early 1986, S & S built eight of these units for Serv–Tech.

On February 19, 1985, Serv–Tech Specialists, Inc., and S & S entered into a "Secrecy Agreement." The agreement recited that Serv–Tech had "rights in certain apparatus and methods for cleaning tube bundles for shell and tube heat exchangers"; that S & S

desired "to receive proprietary information concerning such apparatus and methods (hereinafter 'TECHNICAL INFORMATION') for the purpose of evaluating same and building of prototype equipment for testing and use by Serv–Tech" and that the parties agreed that S & S would "not ... disclose said TECHNICAL INFORMATION to any third party and not ... use said TECHNICAL INFORMATION except for construction and test purposes...." The agreement did not identify the information that was to be protected. This forms the basis for most of the disagreement in this suit. Serv–Tech contended the secrecy agreement covered all components of the Fast Clean machine, while S & S contended the secrecy agreement covered only the cleaning boom arm and that all other components were already well-known in the heat exchanger cleaning business practiced by many companies.

Patent attorneys for Serv–Tech were involved from the outset to develop patents. Patents were applied for in 1985 and were issued for the Fast Clean in February 1989. In accordance with federal patent law, numerous drawings and technical specifications were provided to the public in the patent application, which described, among other things, the cleaning boom-arm, the lance device, the high pressure water control system, the pump system, the remote control panel, the nozzle head, the hydraulic control system and the electrical controls.

In 1986 and 1987, respectively, Serv–Tech hired two engineers from Exxon, Robert Wetzel and Thomas Boisture. In 1989, Wetzel and Boisture, along with two other employees of Serv–Tech, Gene Livingston and James Jeffrey, left the employ of Serv–Tech to form a company to compete in the heat exchanger cleaning business, which business became known as Ohmstede Mechanical Services, Inc. The primary funding for OMSI came from special distributions of approximately four million dollars Ohmstede Inc. voted to its individual (family member) shareholders, who in turn formed OMSI and elected Wetzel its president.

In September, 1989, OMSI entered into a confidentiality agreement with S & S and, based upon sketches of the machine it desired, S & S built for and delivered to OMSI four such machines. Through patent attorneys for OMSI, OMSI was issued five patents for the machine it developed. The design for the Serv–Tech was drastically different from the OMSI machine, was not totally integrated and did not incorporate the cleaning boom arm.

Serv–Tech filed suit against S & S, Ohmstede, OMSI, Wetzel, Livingston, Jeffrey and Boisture on January 26, 1990. Trial was had on Plaintiff's Sixth Amended Petition alleging that the defendants had misappropriated "confidential, trade secret and/or technical information of Serv–Tech." Serv–Tech alleged the trade secret information and technical information "includes, but is not limited to, manufacturing practices, manufacturing drawings, worksheets, reports and other tangibles made in connection therewith, customer information, vendor information, bid information, employee information and budget information." In response to special exceptions, Serv–Tech filed an amended designation listing sixty-four "Particular Items of Trade Secrets/Technical/Proprietary Information" which it contended "each and every Defendant is responsible for the wrongful misappropriation of" as a co-conspirator. In the designation,[1] Serv–Tech further delineated the technical information to be:

1. information relating to the hydroblasting Fast Clean method "with a high velocity comparatively low pressure, high volume shaped stream of water"

2. information on the use of "sub-sonic, comparatively low pressure, high volume shaped stream of water." The benefits of using "a main nozzle pressure of approximately 5,000 6,000 psi and the use of flow rate parameters of 100 gallons per minute on the shell side"

1. Some of the designations are duplicates of, or so nearly duplicates of, others and are not detailed.

3. information that "the key to diesel pump efficiency is the design of the equipment permitting travel of water through the water delivery system with minimized loss of horsepower"

4. information "relating to the importance of mobility * * * to improve the efficiency of these applications"

5. information "regarding the use of flow parameters"

6. "the importance of considering pressure drop in fast clean operations"

7. "the proper placement and mounting of filters, hydraulic systems, hydraulic tank control valves, regulators and air lines for easier accessibility"

8. information on specific parts or components to be used in the construction of fast clean units

9. the design advantage of the system delivering maximum pressure and flow

10. information regarding the specific mounting of hydraulic filters and an electrical distribution panel

11. the design advantages of enclosing and encasing high pressure hoses

12. a main nozzle speed of three to four feet per second

13. information concerning the importance of containing high pressure water hoses within the chamber for safety

14. the "inter-working" of all the various off-the-shelf parts

15. "the conceptual drawings and isometric drawings * * * that disclosed the proper application, usage and design" for the equipment S & S was building for Serv–Tech

16. information concerning "the duty cycles and tube bundle cleaning equipment"

17. information concerning "usage of dual partek L 450 tri-plex pumps with 1½ inch diameter plungers"

18. information concerning use of dual pumps in the event of a pump failure "for customer satisfaction"

19. information concerning the use of power from the pump truck for both the hydraulics and water supply

20. information concerning the proper mounting design and assembly of the transmission components for the pumping units and "the importance in reducing downtime and operators inconvenience"

21. the discovery by Serv–Tech that 6–71 Detroit diesel engines were not powerful enough

22. information concerning the problems "that cyclical loading" creates for the pumps

23. information concerning "time meters and wiring of same" on high pressure pumps

24. information on the requirement for heavy pressure gauges

25. the need for heat exchangers for the hydraulic oil

26. information concerning the designs for intake water filters

27. information concerning the use of "a modulating control valve" to reduce water hammer

28. the importance of designing low point drains in the water system for use in sub-freezing environments

29. information concerning the design and use of coolers including the use of stainless steel

30. information concerning the use of control valves compatible with "refinery supply water"

31. information concerning the "Murphy system" for the pressing of one button for shut down safety

32. information concerning design advantages of using "off-the-shelf" parts for minimizing down time for repair

33. information on design criteria for a high pressure water delivery system including "Fisher Control Valves"

34. charts "interrelating diesel engine RPM with transmission gear ratio" in order to obtain desired delivery of and pressure of water

35. information concerning the sizing of water hoses

36. information concerning the use of high pressure dump valves operated from a remote control box

37. information concerning use of only one dump valve

38. importance of "going from large flapper valve to a small flapper valve to achieve a throttling effect to eliminate water hammer"

39. information on need to arrange components in such way that if suction water tank overflows the overflow does not "cascade into oil reservoirs"

40. information on side load torques that must be considered when designing the boom-arm

41. information on the design, construction and operation of a remotely controlled cleaning lance

42. information concerning the benefits of using multiple lances

43. the design and placement of the lance block

44. the use of plastic runners for the manifold block to minimize friction and information on the friction and wear

45. information that the "lance buckling load" for each lance should be up to 1,000 pounds of force

46. information concerning the importance of using "high strength, light weight" tubes for the lances

47. information concerning the importance of a chamber surrounding the lances to provide buckling support protection

48. information concerning the use of casing for the hoses

49. information concerning the design of indexers for lance configuration

50. information concerning the use of rigid pipes as adaptors on the lance machine

51. information on the use of hydraulically powered drive motors for actuating lances as opposed to pneumatically powered systems

52. information on the design of a lance gun using "force limiting hydraulic controls" to prevent overloading

53. information concerning the use of pressure relief valves of the adjustable type

54. information on the use of lance velocity variance of 0 to 4 feet per second

55. the design, construction and operation of a remote control system

56. information concerning an electrical control system having dual controls

57. information concerning "the use of a remote control system in the positioning of an operator" to increase the efficiency of the cleaning

58. information that remote control boxes should be waterproofed

59. information concerning the use of air driers for the instrument and control system

60. information concerning cable breakage at the control cable plug connection points

61. information regarding the use of a telescoping boom "for sell (sic) side" cleaning.

In this amended designation Serv–Tech also listed eight items of "trade secrets and/or proprietary and confidential information" involved in claims against its former employees and OMSI: (1) man-hour standards, (2) exchanger bid walk documentation, (3) estimating and bid forms, (4) job cost control and progress tracking methods, (5) vendor customer list, (6) employee listing, (7) business plans and (8) "other-general" under which Serv–Tech listed "bid information system"

The individual defendants were non-suited on the day of trial, and following the close of evidence, the case was submitted on nineteen questions. The jury: (1) found that S & S failed to comply with the secrecy agreement; (2) failed to find that S & S engaged in an improper use or disclosure of a trade secret, but found that Ohmstede and OMSI did; (3) found that S & S, Ohmstede and OMSI engaged "in an improper use or disclosure of confidential information of Serv–Tech"; (4) failed to find that S & S engaged "in a civil

conspiracy regarding improper use or disclosure of trade secret information" of Serv–Tech, but found that Ohmstede and OMSI did do so and found that all three appellants engaged in such a conspiracy regarding improper use or disclosure of "confidential information" of Serv–Tech; (5) found that Serv–Tech suffered $12,500,000 damages; (6) failed to find malice; (7) found that OMSI was an alter ego of Ohmstede, and (8) found 40% "of Serv–Tech's recovery" as a reasonable fee for Serv–Tech's attorneys, resulting in the award of $5,000,000 in attorneys fees.

RESTATEMENT (First) OF TORTS § 757 [2] provides:

One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if

(a) he discovered the *secret* by improper means, or

(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the *secret* to him, or

(c) he learned the *secret* from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or

(d) he learned the *secret* with notice of the facts that it was a secret and that its disclosure was made to him by mistake. (emphasis supplied)

In connection with the issue of misappropriation of trade secrets, the trial judge, quoting from comment b to § 757, instructed the jury:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist so that, except by the use of improper means, there would be difficulty in acquiring the information.

In connection with the issue of "improper use or disclosure of confidential information," the trial judge instructed the jury:

"Confidential information"—Although given information is not a trade secret, one who receives the information in a confidential relation or discovers it by improper means may be under some duty not to disclose or use that information. Because of the confidential relation or the impropriety of the means of discovery, he may be compelled to go to other sources for the information. The duty not to use or dis-

close "confidential information" may be imposed by employment or contract where one person trusts and relies upon the other. Such information may be a trade secret or similar specific information received under moral or business circumstances that would reasonably require confidentiality. This is determined by the actual facts of the relationship.[3]

All three appellants assign points of error to the trial court's submission of question 7 and the accompanying definition of confidential information, quoted above, because there is no cause of action for misappropriation of confidential information. Question 7 inquired:

Did any defendant engage in an improper use or disclosure of confidential information of Serv–Tech that was a proximate cause of damage to Serv–Tech?

"Improper use or disclosure" means one who discloses or uses another's "confidential information" and:

(a) he discovered the confidential information by improper means; or

(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the confidential information to him; or

(c) he learned the confidential information from a third person with notice of facts that it was confidential information and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other; or

(d) he learned the confidential information with notice of the facts that it was confidential information and that its disclosure was made to him by mistake.

The jury answered "yes" for all three appellants. Thus, the trial court, in submitting the question and the accompanying instructions, created a cause of action for misappropriation of confidential information by changing the requirement in § 757, subsections (a) through (d) that the "trade secret" be *secret* to a requirement that the matter be only "confidential information."

Appellee argues that there is a cause of action for disclosing confidential information even though the information "is not legally a trade secret," citing RESTATEMENT (First) OF TORTS § 757 (1939). Appellee quotes from comment *b* to the section, as follows:

*Information not a trade secret.* Although given information is not a trade secret, one who receives the information in a confidential relation or discovers it by improper means may be under some duty not to disclose or use that information. Because of the confidential relation or the impropriety of the means of discovery, he may be compelled to go to other sources for the information. As stated in Comment *a*, even the rule stated in this Section rests upon abuse of confidence or impropriety in learning the secret. Such abuse or impropriety may exist also where the information is not a trade secret and may be equally a basis for liability.

We do not regard this comment as authority for appellees contention for several reasons. First § 757 provides for liability *only if* the trade secret is *secret*. Second, appellee's quote from comment *b* conspicuously omits the next sentence: "The rules relating to the liability for duties arising from *confidential relationships generally are not within the scope* of the Restatement of this Subject." (emphasis supplied) Thus, what appellee quotes as a Restatement Rule is not a rule at all—it is merely a statement that a duty under the stated facts *may* arise, but that the subject is not covered by the section. Third, earlier on in comment *b*, from which appellee's quote is taken, the comment plainly requires that "The subject matter of a trade secret must be secret." Fourth, in comment *m* to § 757, it is stated that "The actor is subject to liability under this clause only if the information is secret." Finally, we are not directed to any case, and our own research has not revealed any, where the quoted portion of comment *b* has been adopted or even quoted. Thus we reject appellee's argument that the Restatement of Torts provides a basis for a cause of action

---

**3.** The first two sentences of this instruction were taken from the last paragraph of comment b to

§ 757. The source of the final three sentences is unknown.

for misappropriation of confidential information that is not secret.

Next, appellee argues that "Texas courts have recognized liability for misuse of confidential information in addition to liability for misuse of trade secrets," citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670 (Tex.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). To support it's statement, appellee quotes one sentence from the case: "Examples of legitimate, protectable interests include business goodwill, trade secrets, and other confidential or proprietary information." *DeSantis* involved the breach of an employment contract which included a covenant not to compete. The quoted sentence was taken from that portion of the court's opinion discussing the three criteria necessary for a covenant not to compete to not be in reasonable restraint of trade. The second of those criteria is that the restraint created by the agreement must not be greater than necessary "to protect the promisee's legitimate interest." The court then gave examples of legitimate, protectable interests as "business goodwill, trade secrets, and other confidential or proprietary information." at p. 682. And, as the court stated later in the opinion: "Again, while confidential information *may be protected by an agreement not to compete*, Wackenhut has failed to show that it needed such protection." (emphasis supplied). Thus, the case is not authority to support appellee's cause of action for misapplication of confidential information.

Finally, appellee contends that *K & G Oil Tool and Serv. Co. v. G & G Fishing Tool Serv. Co.*, 314 S.W.2d 782 (Tex.1958) and *Hyde Corporation v. Huffines*, 314 S.W.2d 763, *cert. denied*, 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958) support a cause of action for misapplication of confidential information. The holding in each case was best explained by the supreme court in it's subsequent opinion, *Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336, 339 (Tex.1964):

> In *Hyde Corporation v. Huffines*, this court held the defendant, a licensee of the plaintiff, should be perpetually enjoined from manufacturing or selling any device made substantially in accordance with any feature of an invention patented by plaintiff. The defendant, as a result of a confidential relationship, had gained knowledge of the plaintiff's invention *prior to its being patented*, while it was still a trade secret. The defendant abused this confidential relationship, and improperly used the information gained. (emphasis original)
>
> \* · \* \* \* \* \*
>
> Inasmuch as the defendant had learned the secrets of the plaintiff's invention in confidence, and improperly disclosed and used them before the patent issued, it was held that the defendant should be enjoined from using that knowledge to prevent his obtaining "a marketing advantage or head start as compared to the patentee or any manufacturer or processor licensed by him after the issuance of the patent."
>
> In *K & G Oil Tool & Service Co. v. G & G Fishing Tool Service*, as in the *Hyde* case, the defendant had gained knowledge of the plaintiff's invention prior to its being patented, while it was still a trade secret. ... Under the terms of a licensing agreement, the defendant specifically contracted that during the time it handled the tool in question, no one would disassemble said tool. It was mutually understood that the purpose of such agreement was to guard against anyone determining the internal construction of the tool involved. Notwithstanding this agreement, defendant did disassemble the tool, examined its interior construction and, using the information thus acquired, began making tools substantially in accordance with those of plaintiff. This court held that plaintiff was not deprived of his cause of action for defendant's breach of confidence simply because some of plaintiff's secrets were later disclosed by the issuance of a patent.

Thus, in each of the cases, the defendant, as a result of a confidential relationship, gained knowledge of a trade secret while it was still secret—i.e. prior to the issuance of a patent. We do not discern how either case can be argued to support a cause of action for misappropriation of confidential information that is not secret. Consequently, we do not find any of the reasoning of Serv–Tech to *support* a common law cause of action for misappropriation of confidential information.

The three appellants, on the other hand, contend there is no cause of action for misappropriation of non-secret confidential information, and they cite a number of cases which they assert support such position.

From all the cases we have been able to find, it appears to be well settled that in order to be entitled to common-law protection, a trade secret must be *secret*. *Wissman v. Boucher*, 240 S.W.2d 278, 280 (Tex. 1951); *Hallmark Personnel of Texas, Inc. v. Franks*, 562 S.W.2d 933, 936 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ); *Thermodics, Inc. v. BAT–JAC Tool Company, Inc.*, 541 S.W.2d 255, 260 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ); *Lamons Metal Gasket Co. v. Traylor*, 361 S.W.2d 211, 213 (Tex.Civ.App.—Houston [14th Dist.] 1962, writ ref'd n.r.e.). Appellee apparently has no dispute with this established principle and, as to the trade secrets issue quoted above, the trial court correctly instructed the jury that the matter must be secret.

The definition of "trade secrets" is very broad and loose language used by some courts have appeared to lessen the requirement of secrecy in some instances. On March 12, 1958, the supreme court decided two trade secret cases: *K & G Oil Tool & Service Co., Inc. v. G & G Fishing Tool Service*, 314 S.W.2d 782 (Tex.1958) and *Hyde Corporation v. Huffines*, 314 S.W.2d 763 (Tex.1958). These cases are the bedrock for trade secret causes of action in Texas. As above pointed out, each of the cases involved an actual *trade secret* that was eventually patented. However, prior to the issuance of letters patent the defendant in each of the cases, as a result of a confidential relationship, learned the details of the trade secret and appropriated the secret to its own use. In *Hyde*, the court stated:

> If these details as to construction were received by Hyde Corporation in confidence and that company later attempted to exploit them to Huffines' injury through a breach of confidence, an action lies and *it matters not whether the suit be designated as a "trade secret" case or as a suit for*

*breach of confidence*, which is a term commonly used by Huffines in describing his claim for relief. (emphasis added)

314 S.W.2d at 777. And, in *K & G Oil Tool*, the court stated:

> According to the jury's findings, which are not attached, G & G did not learn how to make the Kirby tool or a device similar thereto by observing it in an assembled or unbroken condition but learned of its internal proportions, qualities and mechanisms by taking it apart despite an agreement that it would not do so. *We have here the violation of a confidence and the breach of a contract.* (emphasis added)

314 S.W.2d at 787. The supreme court's "breach" or "violation" of *confidence* terminology has been changed by some of the courts of appeal to "confidential information."

In *Welex Jet Services, Inc. v. Owen*, 325 S.W.2d 856 (Tex.Civ.App.—Fort Worth 1959, writ ref'd n.r.e.), the Fort Worth court relying upon these cases, changed "violation of a confidence" terminology to *"Confidential information* secured by reason of fiduciary relationships." (emphasis supplied). Even with this more broadly stated rule, however, the court still denied the requested relief because the alleged "confidential information" was "not adaptations of appellant's secrets."

In the trial court appellee argued that *Jeter v. Associated Rack Corp.*, 607 S.W.2d 272 (Tex.Civ.App.—Texarkana 1980, writ ref'd n.r.e.) supported a cause of action for misappropriation of business information.[4] While the recitation of the facts indicates the case was tried on the theory of misappropriation by the plant manager and assistant plant manager of "customer lists, pricing cards, product sketches and sample contact tips, a customized part" of the product, the case was submitted to the jury on only one liability issue:

> Do you find from a preponderance of the evidence that defendants, by using any of the properties obtained from the premises of plaintiff, engaged in a conspiracy to

4. Appellee also cites this case a footnote in its brief before this court, but does not discuss the case.

divert and take away the customers of plaintiff?

The charge did not refer to trade secrets or confidential information. It did not even refer to any item allegedly misappropriated.[5] The court of appeals, pointing out that the question contained "several of the elements necessary to submit to the jury the issue of whether the appellants conspired to and actually did wrongfully misappropriate the confidential business property of Associated Rack," stated that the failure of the issue to require the jury to find the information was "confidential" was not fatal because there was no objection; therefore there was a deemed finding in support of the judgment. The case adds nothing, however, because the deemed finding could as well be that the business property was secret as well as that it was confidential. We simply cannot regard *Jeter* as being authoritative, one way or the other.

In *Richardson v. Andrews*, 718 S.W.2d 833 (Tex.App.—Houston [14th Dist.] 1986, no writ) this court held that because of the conditional language of § 757 in defining what a trade secret *may be*, trade secret status does not automatically attach to the listed examples of what may be trade secrets. It is therefore the burden of the party claiming secrecy status to prove secrecy.

In *American Precision Vibrator Co. v. National Air Vibrator Co.*, 764 S.W.2d 274 (Tex. App.—Houston [1st Dist.] 1988, no writ) the trial court had inquired by a specific question whether the "customer cards and blue prints constituted trade secrets." In passing upon the sufficiency of the evidence the court stated that "Before something can be termed a 'trade secret,' these must be a substantial element of secrecy."

In *Dannenbaum v. Brummerhop*, 840 S.W.2d 624 (Tex.App.—Houston [14th Dist.] 1992, writ denied), one of the causes of action alleged was wrongful appropriation of confidential information. In submitting that cause of action, the trial court instructed the jury:

> You are instructed that confidential information means any process, information or

compilation of information, formula, pattern, or device which is used in one's business and which gives an opportunity to obtain an advantage over competitors who do not know of or use it. *In order to be confidential there must be a substantial element of secrecy; however, secrecy need not be absolute.* Matters of public knowledge or of general knowledge in an industry cannot be appropriated as confidential. The personal efficiency, inventiveness, skills and experience which an employee develops through his work belong to him and not his former employer. (emphasis supplied)

■ While each of these cases, *Welex, Jeter, Richardson, American Precision* and *Dannenbaum,* refer to the basic cause of action as involving "confidential information," all the cases relied upon *Hyde* and/or *K & G Oil Tool.* And each of the cases required that the information be secret or at least substantially secret. Here, however, the trial court neither instructed the jury that the "confidential information" must be secret or substantially secret nor did he submit an inquiry for the jury to make such a finding. From all these cases we conclude that there is no cause of action for misappropriation of confidential information that is not either secret or, at least *substantially* secret.

■ Since all three appellants objected to the failure of the court to instruct the jury that the confidential information must be secret, a deemed finding to supply this essential element cannot be made to support the judgment. *State Dept. of Highways & Public Transp. v. Payne,* 838 S.W.2d 235 (Tex. 1992); S & S's second and fifth points of error are sustained; OMSI's second point of error is sustained and Ohmstede's second point of error is sustained.

All three appellants assign points of error to the manner in which the trial court submitted the damage issue. Conditioned upon an affirmative answer to Questions 1, 4, 7 or 10, Question inquired:

---

5. Because the court's language appeared to be so broad, and it was unclear from the court's opin-

ion as to what other issues were submitted, the court's charge in that case has been examined.

What sum of money, if paid now in cash, would fairly and reasonably compensate, Serv–Tech for its damages, if any, resulting from the conduct in question?

Consider past and future lost profits, if any, which in reasonable probability Serv–Tech will sustain. Do not include any amount for interest on past damages, if any.

Answer in dollars and cents, if any.

Answer: $12,500,000.00

All three appellants objected to the all-inclusive submission of the damage issue for various reasons, including: failure to separate damages issues on each of the liability claims; since different "defendants are accused of misappropriating, through different means, different trade secrets and using them to different degrees," the unsegregated submission denies the defendants "the right to make a proper presentation on appeal" and "to challenge any adverse finding of damages"; "to improperly make the defendants jointly and severally liable for what the jury might find to be discrete torts or a breach of contract, each of which has a different measure, in the jury's mind, of damages;" the issue offers no guidance as to what the appropriate measure of damages is; the issue does not separate past and future damages; the issue assumes that the defendants are going to continue to harm the plaintiff and to continue to impose damages; the issue does not "separately submit questions of past lost profits and future lost profits, and "the absence of an instruction on what future loss of profits means so as to distinguish that which the plaintiff seeks in this case as distinguished from an extrapolation of the present loss at the time of trial." The trial judge overruled all objections.

■ "Damages must be measured by a legal standard and that standard must be used to guide the fact finder in determining what sum would compensate the injured party." *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87 (Tex.1973). It is the duty of the plaintiff to submit separate jury findings on damages. *Lovelace v. Sabine Consolidated, Inc.*, 733 S.W.2d 648, 655 (Tex.App.—Houston [14th Dist.] 1987, writ denied).

It is rather ironic that appellee begins its discussion of this point in its reply brief to Ohmstede's and OMSI's brief, with the statement that the appellants basically take "a shotgun approach to attacking the damage question submitted by the trial court and the accompanying finding by the jury." It appears that it is more appropriate to make this observation about the manner of appellee's submission of the issue. It appears that the shotgun submission of the damage question was designed to prohibit appellants from attacking on appeal the damage finding.

Appellee's only argument in support of the damage question as submitted is:

This is not a case in which two defendants each caused a separate injury, such as where one defendant shot the plaintiff in the arm and another defendant shot the plaintiff in the leg. Rather, this is a case in which one defendant furnished the gun, the other defendant furnished the bullets, and the plaintiff was shot as a result of the combined conduct. There is nothing to segregate. Serv–Tech lost the jobs because OMSI went into business, and OMSI went into is (sic) business because it gained access to Serv–Tech's type equipment. Thus, Stewart and Stevenson caused the whole loss.

We note that appellee does not refer to Ohmstede in his scenario. The only case authority appellee cites in support of it's proposition is *Landers v. East Texas Salt Disposal Co.*, 248 S.W.2d 731 (Tex.1952). In that case two pipelines, one owned by one company and the other by another company, ruptured. Each ruptured line deposited large quantities of salt water and oil onto the plaintiff's property and into his lake, killing his fish and otherwise causing damage. The landowner filed suit against both companies for injunctive relief and damages. The trial court sustained pleas in abatement, dividing the case into three causes: the plea for injunctive relief, and the damage claim against each pipeline company. The supreme court stated:

Where the tortious acts of two or more wrongdoers join to produce an indivisible injury, that is, an injury which from its nature cannot be apportioned with reason-

able certainty to the individual wrong-doers, all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may proceed to judgment against any one separately or against all in one suit.

The *indivisible injury* there, was the injury to the lake and fish. The court stated:

There is, of course, no joint liability for damages for the loss of the trees and grass killed by the salt water escaping from the pipe line owned by East Texas Salt Water Disposal Company before such water entered the lake. It was not a misjoinder, however, to include this as an item of recovery sought in the suit.

■ We cannot agree that based upon the facts of this case that appellee suffered an indivisible injury as a result of the conduct of the three appellants. This is based upon several facts. First, looking to the pleadings and the jury responses to questions, only S & S was the subject of appellee's breach of contract action, and in answer to the first question the jury found S & S breached the contract. There was not even a breach of contract action alleged against Ohmstede and OMSI. While a cause of action was alleged against all three appellants for improper use or disclosure of appellee's trade secret and for conspiracy to do so, the jury failed to find S & S had either improperly used a trade secret of appellee or that it had conspired to do so, although finding Ohmstede and OMSI did do so. As to the alleged cause of action for improper use or disclosure of confidential information and the conspiracy to do so, the jury found all three appellants liable, but we have already held above there is no such cause of action. While the jury found that S & S breached the confidentiality agreement (the contract), they failed to find that S & S improperly used or disclosed the information allegedly protected by the secrecy agreement. This finding and the failure to find is incongruous and, standing alone, reflects the error of not separating the damage question by issue and defendant.

Second, looking to the evidence, we find that the damage question not only improperly combined past and future damages but also combined several damage theories. Appellee's theories of liability included: (1) past profits that it claimed to have lost because some hydroblasting jobs were awarded to OMSI; (2) reduced profit margins that it claimed to have lost on its own hydroblasting work because of competition from OMSI; (3) future profits that it concluded it would lose on hydroblasting work to OMSI between the time of trial and the year 2000; (4) reduced profit margins on its own hydroblasting work because of competition from OMSI for the same period; (5) future profits for "add-on" hydroblasting work that it might lose on hydroblasting jobs that OMSI might secure for the same period and (6) lost profits for non-hydroblasting work, or "incremental work," that it might lose to OMSI during the same period. Serv–Tech's expert witness testified that these separate elements combined to produce total damages of at least 29 million dollars. However, without any guiding standard, the jury found damages of only $12,500,000. While we acknowledge it is not necessary to do so, we do point out that none of the parties are able to calculate this result from the individual elements as calculated by appellee's expert.[6] We believe this evidence, in light of the objections made, required the damage issue to be, at the very minimum, separated as to defendant, cause of action and, past and future damages.

Finally, appellee contended that it had reached an agreement in principle to license its technology and equipment to a Netherlands entity. It contended, however, that S & S, in violation of its confidentiality agreement, cut it out of the deal by selling equipment directly to the Netherlands entity. Serv–Tech claimed that these actions delayed its entry into the European market by a year, thereby causing it to lose revenues. There was no evidence, however, that OMSI or Ohmstede had any connection whatsoever to this transaction. Yet, the jury was autho-

---

**6.** Appellee contends appellants waived any error as to an absence of "legal standards" relating to the measure of damages for failure to object on that ground. We disagree, because we find the above quoted objection to be sufficient. *Dawson v. Garcia,* 666 S.W.2d 254, 261 (Tex.App.—Dallas 1984, no writ).

rized to take this evidence into consideration of damages, and, from all we know, assess damages against OMSI and Ohmstede for actions for which neither was liable. Again, this evidence illustrates why the trial court should have responded to appellants' objections to the all-inclusive submission of the damage question.

In *Wingate v. Hajdik,* 795 S.W.2d 717 (Tex.1990), Wingate sued Hajdik on two causes of action—one for misappropriation of corporate assets and the other for breach of fiduciary duty to Wingate as a business partner. In a trial to the court, the court awarded Wingate a single sum of actual damages predicated upon multiple liability findings. The court of appeals reversed and the supreme court agreed, holding that the trial court erred in including in the damages awarded amounts which only the corporation was entitled to recover. It was therefore necessary to reverse the entire judgment because the plaintiff's award of a single sum of damages was predicated upon multiple liability findings—one of which he was not entitled to recover on. The converse of that situation is presented by this case—the trial court authorized and the jury found a single sum of damages against three defendants predicated upon multiple liability findings where one of the defendants was not shown to be liable on one of the liability findings.

In *Dawson v. Garcia,* 666 S.W.2d 254 (Tex. App.—Dallas 1984, no writ) the trial court submitted a single damage issue which erroneously mixed recoverable and nonrecoverable damages. Appellee's contention on appeal was that appellant's objection that it "would be impossible to divide with regard to what portion relates to nonrecoverable items and damage" was insufficient. The court of appeals reversed, holding the objection was sufficient and the single submission was error.

In *Lucas v. Nesbitt,* 653 S.W.2d 883 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.) the trial court submitted issues to the jury on negligence and violations of the DTPA—all of which were answered favorably to the plaintiff. In submitting the damage issue, the trial court inquired what sum of money would reasonable compensate the plaintiff "for the financial loss, if any, sustained by [the plaintiff] resulting from the acts of" the defendant. The court stated:

In answering such issue, the jury was allowed to consider the evidence of six separate charges of negligence and at least one of two of the allegations that constituted a violation of the DTPA. The jury was not asked to consider the damages resulting from "any one of the negligent acts of appellant" nor was the jury asked to find the damages from "either or both of the alleged violations of the DTPA." Therefore, the jury's finding of $83,000.00 *"resulting from the acts of"* appellant included the damages for all of the causes of action. We have no way of separating the damages for actions of negligence and those concerning the violations of the DTPA. The judgment does not comport with the jury's verdict on the damages. To correctly award $83,000.00 as compensation for appellant's negligence, the trial court would have had to assume that the jury attributed no damages to the DTPA violation. This the trial court did not do. To correctly award three times $83,000.00 under the DTPA, the court would have had to assume a zero finding on damages for negligence. This the trial court could not have done. (emphasis original)

In *Chrysler Corporation v. McMorries,* 657 S.W.2d 858 (Tex.App.—Fort Worth 1983, no writ) the trial court submitted a single damage issue inquiring "what sum of money ... would reasonable compensate [plaintiff] for his actual damages, if any." In reversing, because the instruction was insufficient under the facts of the case, the court stated:

There are no limitations placed upon what the jury may consider in determining the damages. Given this charge, the jury could have looked to anything at all, including injuries which may not have been caused by the appellant's actions. Because of this danger, the Texas courts have insisted that the trial court limit the jury's consideration to the specific facts that are properly a part of the damages allowable. Consequently, the trial court's judgment must be reversed and remanded.

We conclude our discussion by reference to *Wilgus v. Bond,* 730 S.W.2d 670 (Tex.1987). In that case the trial court submitted two damage issues that failed to relate elements of damage to specific theories of recovery. The court of appeals reversed for this reason. The supreme court reversed the court of appeals stating "Although we agree that damages must be measured by a legal standard which serves to guide the jury in determining compensation for the injured party, the Bonds waived any error in the submission by failure to properly object." In our case, appellants properly objected to the all-inclusive submission of the damage issue. We sustain S & S's eleventh point of error, OMSI's fourth point of error and Ohmstede's sixth point of error.

Related to the damage issue in S & S's point of error twelve complaining of attorney's fees. Over proper objections by S & S, the trial court submitted Question 19 which inquired:

> What is a reasonable fee for the necessary services of Serv–Tech's attorneys in this case, stated as a percentage of Serv–Tech's recovery?
> Answer by stating a percentage.
> ANSWER: 40%

Based upon this answer the trial court awarded attorney's fees against S & S for $5,000,000 (40% of the total recovery of $12,-500,000).

> The trial judge provided in the judgment: Under the verdict, Plaintiff has a right to recovery from Stewart & Stevenson Services, Inc. for breach of contract and/or for tort. The greater recovery for Plaintiff would be for breach of contract because it allows for attorney fees. Without waiving Plaintiff's right to recover against Stewart & Stevenson Services, Inc. for tort, the Court grants recovery against Stewart & Stevenson Services, Inc. primarily for breach of contract.

■ A party may recover attorney's fees only if permitted by contract or by statute. *Moody v. EMC Services, Inc.,* 828 S.W.2d 237, 246 (Tex.App.—Houston [14th Dist.] 1992, writ denied). If the case involves claims for which attorney's fees are recovera-ble and claims for which attorney's fees are not recoverable, the authorized fees must be segregated from the fees connected to the other claims. *Id.*

■ In its brief, appellee does not even mention the above unorthodox provision of the judgment and does not attempt to justify the award of attorney's fees under its provision. Rather, appellee argues that "in this case the breach of contract as well as the tort occurred simultaneously and in concert and together produced the damages." Under such circumstances, appellee argues that this court's decision in *Gill Savings Association v. Chair King, Inc.,* 783 S.W.2d 674 (Tex. App.—Houston [14th Dist.] 1989, aff'd in part and modified in part), 797 S.W.2d 31 (Tex. 1990), "is in point." We disagree. In *Gill,* the trial was before the court which awarded actual and punitive damages and attorney's fees in a suit "for fraud, breach of contract and numerous other torts." The trial judge assessed a sum certain as attorney's fees which this court and the supreme court held was proper based upon a breach of contract. Here a sum certain for attorney's fees based upon the breach of contract was not award-ed—rather the jury was asked to find, and they did find, a percentage of the total recovery as "a reasonable fee for the necessary services" of the attorneys. This was improp-er because it permitted appellee to recover attorney's fees on claims for which attorney's fees are not recoverable. See: *Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991); *Matthews v. Candlewood Build-ers, Inc.,* 685 S.W.2d 649, 650 (Tex.1985). We sustain S & S's twelfth point of error.

In OMSI's first point of error and Ohms-tede's third point of error, both appellants contend that "neither law nor fact supports the trade secret misappropriation against" either of them.

"The basis of the trade secret case is the 'breach of contract or wrongful disregard of confidential relationships.'" *K & G Oil Tool & Service Co. v. G & G Fishing Tool Service Co.,* 314 S.W.2d 782, 787 (Tex.1958); *Becher v. Contoure Laboratories,* 279 U.S. 388, 49 S.Ct. 356, 357, 73 L.Ed. 752 (1929); *E.I. DuPont de Nemours Powder Co. v. Masland,*

244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016 (1917).

The only contract involved was between S & S and appellee. While the jury found S & S breached the contract, it failed to find that S & S improperly used or disclosed trade secrets of appellee and further failed to find that S & S conspired to improperly use or disclose trade secrets of appellee. There was no confidential relationship between appellee and Ohmstede or OMSI. This being so, neither Ohmstede nor OMSI are *directly* liable to appellee under the jury finding that both improperly used or disclosed and conspired to improperly use or disclose trade secrets of appellee. Appellee does not argue to the contrary.

Appellee contends however, that both Ohmstede and OMSI are liable because the ex-employees of Serv–Tech, "who formed the *management nucleus of OMSI*," obtained information about Serv–Tech's trade secrets as a result of a confidential relationship while they were employees of Serv–Tech.

*Atlas Bradford Co. v. Tuboscope Co.*, 378 S.W.2d 147 (Tex.Civ.App.—Waco 1964, no writ) seems to be contrary to appellee's contention, but we question its soundness. In that case, Unger, an employee of Tuboscope learned its trade secrets. Subsequently a patent was issued covering those secrets. After Unger left Tuboscope's employment, Unger disclosed the trade secrets, which had already been patented, to Atlas. The trial court (1) permanently enjoined the use and disclosure of the trade secrets by Unger; (2) permanently enjoined the use and disclosure of the trade secrets by Atlas; and (3) awarded damages against Atlas. The court of appeals reversed and rendered judgment in favor of Atlas on the basis that the public disclosure of the patents made the information public, insofar as Atlas was concerned, and Atlas was entitled to use the information free of restraint on the ground that the information constituted a trade secret. It appears to us that this language does not take into consideration that the test is not whether one *could have* gained the knowledge lawfully, but *how* it was gained. See: *Hyde Corporation* at 778. But, whether the language of *Atlas Bradford* is overbroad, the case is not determinative of the issue presented by appellants Ohmstede and OMSI. Both contend there is no evidence that the former Serv–Tech employees who worked at OMSI or S & S disclosed Serv–Tech secrets in violation of a confidential relationship.

In accordance with the RESTATEMENT (First) OF TORTS, § 757, the trial judge instructed the jury that "improper use or disclosure" means one who discloses or uses another's trade secret and

(a) he discovered the secret by improper means, or

(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or

(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or

(d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake.

The only conceivable theory under which Ohmstede and OMSI could be liable is under (b); i.e. the liability findings against OMSI and Ohmstede can result only from the premise that OMSI received Serv–Tech's alleged trade secrets from Wetzel, Boisture, Livingston and Jeffrey, former employees who joined OMSI. Appellants contend that the jury's adverse finding "completely disregarded the clear, uncontradicted testimony" of the former employees and officials of OMSI and "the finding can result only from legally incorrect conclusions about the relationship between the former employees and OMSI or inferences piled upon inferences." This is a challenge to the legal sufficiency of the evidence, and we do not understand appellee to contend otherwise.

We are not particularly impressed with the manner in which either side has briefed this issue. Of course, we realize that the issue is complicated many fold by the manner in which the case was tried. As set forth, appellee alleged that the appellants had misappropriated not only trade secrets (which

would be included within the accepted Restatement definition) but that they had misappropriated various other items of "confidential information." Appellee's theory at trial was, in the words of Serv–Tech's Dick Krajicek, that OMSI took "our ideas, our concepts, our equipment, our planning, our people and our customers." And, as above set forth, the case was submitted to the jury not only on a proper theory of misappropriation of a trade secret but also on an improper theory of misappropriation of confidential information. Further complicating the issue presented is the fact that based upon a reading of this total record, it appears that the only conceivable explanation for the failure of the jury to find that S & S had not misappropriated Serv–Tech's "trade secret" was that the Fast Clean machine invention of Serv–Tech was not a trade secret, or at least the cleaning boom arm, which was not copied, was the only item protected by the secrecy agreement. Yet the jury did find OMSI and Ohmstede did misappropriate trade secrets. It seems the only conceivable explanation for this result was that the jury found that OMSI and Ohmstede had misappropriated items, other than Serv–Tech's Fast Clean machine, which were trade secrets.

At least as to this latter theory, appellee seems to agree. In appellee's response brief, it begins its argument on this point, as follows:

> In answer to Question No. 4, the jury found that OMSI [and Ohmstede][7] engaged in an improper use or disclosure of a trade secret of Serv–Tech that was a proximate cause of damage to Serv–Tech. These trade secrets consisted of two different types of information. The first concerned the FAST CLEAN equipment. Wetzel, a Serv–Tech employee hired by OMSI, had worked with Stewart & Stevenson in perfecting the Serv–Tech machinery. Wetzel participated in the "debugging"[8] of the FAST CLEAN equipment after it was delivered. The debugging efforts resulted in negative "know-how" that

was in and of itself valuable information identified by Serv–Tech, that was entitled to protection as a trade secret.

> The second group of trade secrets ... information concerned the bidding system and other business information. The evidence clearly proved that OMSI was the beneficiary of business information purloined by Wetzel and his colleagues. The heat exchanger data sheets, man-hour standards, job tracking system, employee lists, vendor list, bid programs, bid forms and many other categories of information virtually mirrored Serv–Tech's. This information was proprietary and confidential in nature.

It is in the context of this "second group of trade secrets" that we discuss the issue presented.

■ When legal insufficiency of the evidence is challenged, this court must consider only the evidence and inferences that support the challenged findings and will disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). If we find any probative evidence that supports the jury finding, the point will be overruled. *Anthony Pools v. Charles & David, Inc.,* 797 S.W.2d 666, 675 (Tex.App.—Houston [14th Dist.] 1990, writ denied). If, however, a search of the record discloses no probative evidence, then the court will sustain the point and reverse and render judgment. *National Life and Accident Ins. Co. v. Blagg,* 438 S.W.2d 905, 909 (Tex.1969).

■ Following this test, we detail the evidence which would support he jury finding concerning the misappropriation of, among other things; Serv–Tech's bidding system and man-hour standards:

1. Bob Wetzel joined Serv–Tech in 1986 and was employed in responsible positions until he departed the company in 1989.

2. Wetzel was the driving force in forming OMSI in 1989, a company to compete

---

7. Ohmstede is added because appellee does not separately discuss this issue in it's reply to Ohmstede's brief but there relies upon its discussion to OMSI's first point of error.

8. "Debugging" was described by various witnesses to be basically a refinement of the equipment as a result of trial and error, i.e. following breakdowns or failure to produce as expected.

with Serv–Tech in the heat exchanger cleaning business, and was its president.

3. Dick Krajicek testified that when Wetzel joined Serv–Tech he did not know how to bid heat exchanger jobs; Wetzel learned the bidding system while employed by Serv–Tech and he "definitely" helped refine it; Wetzel realized that the forms for the bidding system were valuable to the company and began the practice of stamping "confidential" on all the forms and both he (Krajicek) and Wetzel considered the bidding process secret.

4. Mike Krajicek, a Serv–Tech officer, testified that while Wetzel was employed by Serv–Tech he (Wetzel) worked extensively with the bidding process; that if Wetzel had not worked for Serv–Tech for 2 or 3 years he would not have had knowledge of "our bidding system"; that I have learned from customers that OMSI's bidding system "is remarkably similar, both in the forms that they use and whats inside that form the content" to ours; that the bidding form is not the "heartbeat" of our system, but I have not seen any other competitors [other than OMSI] use this type form; that Serv–Tech "strived to keep the bidding system confidential; that Wetzel updated Serv–Tech's man power requirements (the basis used for estimating man-hours on a job) and had very intimate knowledge of our man-hour standards; Wetzel helped design the estimating form used for estimating jobs; Wetzel prepared the black book that went to the job superintendent to keep the job on target.

5. John Slack, a Serv–Tech employee, testified that he worked with Wetzel while at Serv–Tech; that when Wetzel left Serv–Tech he had an intimate knowledge of our bidding system; the bidding system was a critical element of our business and as such was considered "very confidential" and that Wetzel would have known the bidding form was confidential because it was imprinted "Confidential, All Rights Reserved, Serv–Tech."

6. Wetzel testified he created many of Serv–Tech's spreadsheets on his computer at home.

7. Donald Polk testified he had worked for Serv–Tech and was later hired by Wetzel to work for OMSI; that Wetzel gave him the document concerning the man-hour standards that he was to use in bidding jobs; that he recognized OMSI's bid system "as very similar" to Serv–Tech's; that later after a lawsuit was filed, Wetzel instructed him and Ron Sinks to change the forms because "they were too close to Serv–Tech's"; that they knew about what Serv–Tech's bid would be and that Wetzel instructed him to "bid in a way to make sure we outbid Serv–Tech."

8. Vince Gulati of Price–Waterhouse, testified he had examined and compared the computer programs, the job analysis sheets, the heat exchanger data sheet job walk form and man-hour standards of OMSI and Serv–Tech and they were "essentially the same," "essentially similar," "strikingly similar" or "virtually identical"; that "Omsi was trying to copy Serv–Tech's standards, and they had the knowledge of what Serv–Tech is bidding at" and that if one knows the bidding system of a competitor, that fact gives him a competitive advantage, and that in order to examine OMSI's forms, he had to sign a confidential agreement.

We have, consistent with our duty under a "no evidence" challenge, completely disregarded any and all evidence contrary to the jury finding.

OMSI and Ohmstede argue that the knowledge of Wetzel cannot be imputed to OMSI because the knowledge of an agent "cannot be imputed to a principal if the agent has a personal adverse interest in not revealing it," citing *Arabesque Studios, Inc. v. Academy of Fine Arts, Int'l., Inc.,* 529 S.W.2d 564, 568 (Tex.Civ.App.—Dallas 1975, no writ). In this "no evidence" challenge, we cannot assume that Wetzel had a "personal adverse interest in not revealing" the trade secrets.

From the above, we find there is some evidence to support the jury finding as it relates to trade secrets in the form of Serv–Tech's bidding system and overrule appellant OMSI's first point of error and Ohmstede's third point of error.

Ohmstede, in its second point of error, and OMSI, in its fifth point of error, contend there was legally and factually insufficient evidence to support the jury finding that OMSI was the alter ego of Ohmstede. Even though we have already determined the judgment must be reversed, we must determine the law question presented by these points because, if sustained, it results in a rendition of judgment in favor of Ohmstede.

Prior to the time Wetzel left Serv–Tech, he and three other Serv–Tech employees discussed, with some regularity, departing Serv–Tech and forming a company to compete in the heat exchanger cleaning business. Wetzel contacted Ohmstede, Inc., and subsequently, through distribution to various of the Ohmstede family stockholders, almost 4 million dollars was invested in and became the initial capitalization of OMSI upon its formation. Subsequently, another $1.7 million was loaned, on an unsecured basis, to OMSI by Ohmstede. Ohmstede (the corporation) did not own any of the OMSI stock.

Appellee alleged OMSI was the alter ego of Ohmstede. Question 16, which the jury affirmatively answered, was:

Was OMSI an alter ego of Ohmstede, Inc.?

You are instructed that one corporation is an alter ego of another corporation when there is such unity between them that there is not a separateness of the corporations or when the facts are such that not recognizing one corporation to be responsible for the conduct of the other corporation would sanction a fraud, promote injustice, lead to an inequitable result, or cause harm. Consider the total dealings of Ohmstede, Inc. and OMSI in determining whether OMSI was an alter ego of Ohmstede, Inc. Without having to establish any particular number of them, factors to be considered in this regard include:

(1) Identity of shareholders, directors, officers, and employees;

(2) Failure to distinguish in ordinary business between the two entities;

(3) Failure to observe corporate formalities;

(4) Whether operating capital of one corporation is provided by the other corporation or whether the capital is borrowed from other sources;

(5) The extent to which separate books and accounts have been kept;

(6) Whether the two entities have common departments of business;

(7) Whether the two entities have separate meetings of shareholders and directors;

(8) Whether an officer or director of one corporation is permitted to determine the policies of the other; and

(9) Whether the two entities filed consolidated tax returns;

(10) Any other facts indicating the other entity is a mere conduit.

Answer "Yes" or "No."

Appellants detail the following as the "only facts in evidence that could even arguably support the jury's finding" that OMSI was Ohmstede, Inc.'s alter ego:

(1) Ohmstede, Inc. voted to make special distributions (approx. $4.0 million) to its individual shareholders who in turn formed OMSI, of which Wetzel would be in charge. Ohmstede, Inc. holds no stock in OMSI.

(2) Ohmstede, Inc. and OMSI have common shareholders, officers and directors.

(3) The organizational meeting of OMSI was not formally held, and the address of OMSI was listed at that time as the same address as Ohmstede, Inc.

(4) Ohmstede, Inc. loaned additional funds (approx. $1.7M) to OMSI, on an unsecured basis.

(5) The original purchase order for OMSI's equipment from Stewart & Stevenson was on an Ohmstede, Inc. form because OMSI had no forms at the time.

(6) Ohmstede, Inc. and OMSI shared some administrative services like accounting and Ohmstede, Inc. and OMSI occasionally performed other services for each other, although they had an arms-length relationship. The companies maintained separate accounting records.

(record references for each item of evidence is omitted).

Appellee lists two additional factors in it's brief "that contribute to [the jury's] conclusion":

1. In his capacity as president of OMSI, Wetzel had little authority in that he was limited to see that orders of resolutions of the Board of Directors were carried out subject to the right of the Board of Directors to delegate specific powers. Wetzel could only execute a bond, mortgage or other instrument in the corporation's name if authorized by the Board of Directors. There was not one thing that he was allowed to do, under the bylaws of OMSI without direct authorization from the Board of Directors.

2. Virtually all of OMSI's marketing efforts were designed to ride the coat tails of Ohmstede based on its history and experience with heat exchanger cleaning equipment. Marketing brochures and Ohmstede employees were used to introduce the range of OMSI services that were available.

(record references are, again, omitted).

First, appellants argue that Ohmstede's lack of ownership interest in OMSI prohibits liability under an alter ego theory. This court has twice stated that the alter ego doctrine is inapplicable to a situation where the individual owned none of the outstanding stock. *George v. Houston Boxing Club, Inc.*, 423 S.W.2d 128 (Tex.Civ.App.—Houston [14th Dist.] 1967, writ ref'd n.r.e.); *Patterson v. Wizowaty*, 505 S.W.2d 425 (Tex.Civ.App.—Houston [14th Dist.] 1974, no writ). The first court has likewise stated the same rule. *Lane v. Dickinson State Bank*, 605 S.W.2d 650 (Tex.Civ.App.—Houston [1st Dist.] 1980, no writ). Following Texas law, the fifth circuit has twice held that a corporation and an individual will not be treated as one and the same unless there is some ownership interest in the corporation. *Zahra Spiritual Trust v. U.S.*, 910 F.2d 240 (5th Cir.1990); *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635 (5th Cir.1991).

Appellee's counter argument is that none of these cases state "an absolute rule that would preclude the imposition of alter ego liability *or disregard of a corporate entity*, despite lack of stock ownership, based upon appropriate circumstances." (emphasis supplied). It appears that appellee attempts to inject, by the italicized phrase, bases other than alter ego for disregarding the corporate fiction and treat alter ego as a synonym for the entire doctrine of disregarding the corporate fiction. See: *Castleberry v. Bascum*, 721 S.W.2d 270, 272 (Tex.1986). As pointed out in *Castleberry* there are numerous bases for disregarding the corporate fiction—alter ego being only one of them. *Id.* at 272. There would appear there could be multiple "appropriate circumstances" for *disregarding the corporate entity* despite a lack of stock ownership in bases other than alter ego. In *Castleberry*, the supreme court stated—alter ego:

is shown from the total dealing of the corporation and the individual, *including* the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, *the amount of financial interest, ownership and control the individual maintains over the corporation,* and whether the corporation has been used for personal purposes. *See Lucas v. Texas Industries, Inc.*, 696 S.W.2d 372, 374 (Tex.1984). (emphasis supplied)

While this italicized language does not affirmatively state that ownership is mandatory, it appears that financial interest or ownership or control by the parent corporation would be necessary for a finding of *alter ego*.

 We agree with the above authorities and hold that if the basis for disregarding the corporate fiction is *alter ego*, as opposed to any of the other bases, it is necessary that there be some financial interest, ownership or control by the corporation sought to be held liable for the tort of the other corporation, in the other corporation.

Appellee argues that even if "stock ownership is required to predicate a corporate disregard on the independent theory of alter ego, there is no harm and, hence, no likelihood that an improper judgment was rendered against Ohmstede since the same result follows by virtue of the ability to support a finding that Ohmstede used OMSI as a sham to perpetuate a fraud." Appellee bases this argument upon his theory that "the find-

ings [are] inherent in the jury's verdict that also support the disregard of corporate entity based on the existence of a sham to perpetuate a fraud." Appellee points to that portion of the instruction where the trial judge told the jury that not recognizing one corporation to be responsible for the conduct of another corporation "would sanction a fraud, promote injustice, lead to an inequitable result or cause harm."

Appellee relies upon *Castleberry* to support this alternative reasoning. In that case, however, there was *abundant evidence* of a sham to perpetuate a fraud. The trial court instructed the jury on alter ego. However in doing so, he "blurred the distinction between alter ego and the other bases for disregarding the corporate fiction" and instructed the jury that a corporation may become an alter ego of an individual *"if the individual is using the corporate entity as a sham to perpetuate a fraud or to avoid personal liability."* In the case before us we have not been cited to any evidence and our reading of the extensive record reveals *no evidence* that failure to observe the corporate fiction in this case would sanction a fraud, lead to an inequitable result or cause harm. Thus, we reject appellee's alternative reasoning.

In addition to this "ownership relationship" attack upon the finding of alter ego, appellants also assert the evidence is legally insufficient to establish that Ohmstede was OMSI's alter ego upon another basis.

The instruction accompanying the jury question on alter ego, set out above, authorized the jury to consider ten factors in determining whether OMSI was the alter ego of Ohmstede:

1. identity of shareholders, officers and directors
2. failure to distinguish business
3. failure to observe corporate formalities
4. whether corporate capital is provided by one to the other
5. separateness of books and accounts

6. commonness of departments of business
7. separateness of directors meetings
8. whether director of one is permitted to determine policies of other
9. whether consolidated tax returns were filed
10. any other facts indicating one entity is mere conduit.

Appellants objected to the question as being a comment on the weight of the evidence and requested the court submit an instruction consistent with *Castleberry*. In addition, appellants submitted in writing the following requested instruction, upon which the trial judge noted his refusal, which came verbatim (with the exception of using the word "corporation" here for the word "individual" in *Castleberry*) from Castleberry:

"Alter ego" means there is such unity between one corporation and another that the separateness of the corporations has ceased and holding only the corporation liable would result in injustice. It is shown from the total dealings of the corporations and the shareholders, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control one corporation maintains over the other corporation and whether the corporation has been used for personal purposes. Alter ego's rationale is that if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors.

■■■ Appellants state in their brief, and appellee does not dispute in it's brief, that there is no evidence to support the jury considering six of the ten factors, number:

2. failure to distinguish business
4. whether corporate capital is provided one to the other [9]
5. separateness of books and accounts
7. separateness of directors meetings

9. As pointed out earlier in the opinion the capitalization was provided through distributions by Ohmstede, Inc. to some of its shareholders who then invested in OMSI. There was no evidence Ohmstede, Inc. owned any OMSI stock.

9. whether consolidated tax returns were filed

10. any other facts indicating one entity is merely a conduit.

We believe *Lucas v. Texas Industries,* 696 S.W.2d 372 (Tex.1984) is determinative. In that case the court pointed out that in a tort case it is not necessary to find an intent to defraud but that "generally, in a tort case the financial strength or weakness of the corporate tortfeasor is an important consideration." Further, the court stated:

If the corporation responsible for the plaintiff's injury is capable of paying a judgment upon proof of liability, then no reason would exist to attempt to pierce the corporate veil and have shareholders pay for the injury. If, however, the corporation sued is not reasonably capitalized in light of the nature and risk of its business, the need might arise to attempt to pierce the corporate veil and hold the parent corporation liable.

In that case the supreme court pointed out that *Lucas* attempted to justify piercing Structural's corporate veil by evidence that:

1. TXI and Structural had some of the same officers and directors

2. TXI and Structural filed consolidated income tax returns

3. TXI and Structural used the same corporate logo

4. TXI suggested safety procedures to be used in Structural's manufacturing plants

5. Structural borrowed money from TXI

6. the Structural officer who signed the contract with Everman signed on a line labeled "Texas Industries, Inc."

7. in response to interrogatories, TXI stated it delivered the beam, which injured Lucas, to the jobsite.

The jury found that Texas Industries, Inc. and TXI Structural Products, Inc., activities became so blended that TXI for all practical purposes, became the alter ego of Texas Industries, Inc.

This court affirmed the trial court's judgment. *Texas Industries v. Lucas,* 634 S.W.2d 748 (Tex.App.1982). Interestingly, this court pointed out items of evidence, in addition to those listed above by the supreme court, as justification for affirming the finding of alter ego. 634 S.W.2d at 753.

Holding there was no evidence of alter ego, the supreme court stated:

While this is a tort case, no evidence was introduced by Lucas that would indicate that Structural was undercapitalized or incapable of paying a judgment if found liable. The fact that TXI and Structural may have had some or all of the same directors or officers, that TXI and Structural may have filed consolidated income tax returns, that they shared the same corporate logo, or that the two companies conducted intercorporate business did not induce Lucas to fall victim to a basically unfair device by which Structural's corporate entity was used to achieve an inequitable result.

The facts relied upon by appellee in this case are no stronger than the facts relied upon by Lucas in the *Lucas* case. Accordingly we find no evidence to support the jury finding of alter ego.

■ Finally, appellants contend the instruction was erroneous and the trial court should have responded to their objection and requested instruction. Appellee challenges the sufficiency of the objection. It would appear that in view of *State Department of Highways & Public Transportation v. Payne,* 838 S.W.2d 235 (Tex.1992) the objection, fortified by the requested instruction, is sufficient, and we so hold. We do so to point out that we believe the instruction is faulty and that trial courts should seriously consider following the requested instruction taken from Castleberry. 721 S.W.2d at 272. As we have earlier pointed out, the trial judge included within the alter ego theory another theory for disregarding the corporate veil—fraud. This was condemned in Castleberry. *Id.* at 275–276. Further, the instruction totally fails to include any reference to "the amount of financial interest, ownership and control the individual [corporation, here] maintains over the" other. *Id.* at 272.

We sustain appellant Ohmstede's second point of error and OMSI's fifth point of error in that we find no evidence to support the jury finding that OMSI was the alter ego of

Ohmstede. If it was necessary for us to rule upon the factual sufficiency challenge, we would likewise find the evidence factually insufficient to sustain such finding.

Appellee, Serv–Tech has assigned two cross-points. By the first cross-point it contends the trial court erred in not awarding pre-judgment interest. We need not pass upon this issue since the judgment is reversed.

In its second cross-point appellee contends that in the event the judgment as to S & S is reversed, then the case should be remanded for another trial because the trial court erred in the jury charge regarding S & S's having improperly used or disclosed trade secrets.

Appellee objected to the definition of trade secret, quoted earlier in this opinion, and requested the following:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. To be a trade secret absolute secrecy is not required; however, the trade secret must not be generally known to or used by the industry or a matter completely disclosed or ascertainable at a glance. A trade secret is not a trade secret if the owner of the trade secret fails to take reasonable steps to protect his trade secret. However, the owner of the trade secret is not required to take extraordinary measures to protect his trade secret.

The definition given by the trial court, and previously quoted, was taken verbatim from the Restatement. The supreme court has twice previously adopted the Restatement definition of "trade secret." *Wissman v. Boucher*, 240 S.W.2d 278 (Tex.1957) and *Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336 (Tex. 1964). Additionally, we have cited numerous cases in the discussion above that a trade secret must be secret. Appellee's requested instruction omits this essential element and was therefore not a correct statement of the law. The trial court properly overruled appellee's objection and denied its requested instruction. Appellee's second cross-point is overruled.

The judgment is reversed and rendered as to causes of action for misappropriation of confidential information; the judgment is reversed and rendered as to the finding that OMSI was the alter ego of Ohmstede and the remainder of the judgment is reversed and remanded for a new trial.

DRAUGHN, J., dissents.