Affirmed in Part, Reversed and Remanded in Part, and Memorandum Opinion
filed May 8, 2008








Affirmed in
Part, Reversed and Remanded in
Part, and Memorandum Opinion filed May 8, 2008.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00717-CV

____________

 

SP MIDTOWN, LTD. d/b/a SPACE PLACE
MIDTOWN,
Appellant

 

V.

 

URBAN STORAGE, L.P. d/b/a MIDTOWN
MINI STORAGE and d/b/a MIDTOWN MINI WAREHOUSE and d/b/a MIDTOWN SELF STORAGE,
MIDTOWN STORAGE, L.L.C., and THE JENKINS ORGANIZATION, INC. Appellees

 



 

On Appeal from the 80th
District Court

Harris County, Texas

Trial Court Cause No. 2005-77930-A

 



 

M E M O R A N D U M  O P I N I O N








This is an appeal from the granting of a no-evidence
summary judgment in favor of appellees, Urban Storage, L.P. d/b/a Midtown Mini
Storage and d/b/a Midtown Mini Warehouse and d/b/a/ Midtown Self Storage,
Midtown Storage, L.L.C., and The Jenkins Organization, Inc. (collectively AMidtown@).  In two issues,
appellant, SP Midtown, Ltd. d/b/a/ Space Place Midtown (ASpace Place@), argues (1) the
trial court erred in granting Midtown=s no-evidence
motion for summary judgment because Space Place presented more than a scintilla
of evidence on each challenged element, and (2) the trial court erred in
denying Space Place=s objections to Midtown=s summary judgment
evidence.  We affirm in part, and reverse and remand in part.

Factual and Procedural Background[1]

Mark Getz serves as the president of SPMT, Inc., which is
the general partner of Space Place.  Space Place owns a self-storage facility
located at 3011 San Jacinto Street, Houston, Texas, and in April 2005, Getz
hired Stacy Welch as the on-site property manager of this facility.  As a
precondition to her employment, Getz required Welch to complete both an
employment application and an employment contract.  The employment application,
which Welch signed, stated if she was actually employed she Aagree[d] to abide
by [the] Employer=s rules, procedures, and policies.@  The employment
contract, which Welch also signed, stated one of the manager=s responsibilities
was to keep all information regarding the facility and its tenants in Astrict confidence.@  According to
Getz, he agreed to pay Welch a particular compensation because she agreed to
the terms of the employment contract.








In November 2005, Getz learned he needed surgery, and as a
result, he spent a great deal of time visiting doctors and submitting to
medical tests.  Also, during this same time period, Getz had to cover for other
employees who were on vacation.  For these reasons, Getz was frequently away
from the facility, so he relied on Welch more than usual.  However, at the
beginning of November, unbeknownst to Getz, Welch met with Brett Dames, a
manager of Midtown.  Dames offered Welch a job as a manager for Midtown, and he
offered her a sign-on bonus, which according to Getz, is a practice virtually
unheard of in the storage-facility industry.  Furthermore, it was Midtown=s policy to pay
bonuses to its managers based on new business they brought to Midtown.  Welch
accepted the job with Midtown, but continued working at Space Place=s facility until
the end of the month.

Once Getz was able to focus his attention on the business
at the facility Welch was managing, he learned sales had dropped
significantly.  Upon inspection of his books, Getz discovered Welch made four
sales in the first four days of November, but she made no other sales the rest
of the month.  Getz knew this was unusual for the business, and he began
suspecting Welch of wrongdoing.  To investigate his suspicions, Getz asked
Beverly Schaffer to call Welch and pose as a potential customer.  According to
Schaffer, Welch quoted her Space Place=s prices but told
Schaffer Space Place did not have any 10 x 20 foot units available.  Welch told
Schaffer a 10 x 15 foot unit would probably work, and she could transfer to a
larger unit when one became available.  But, as the conversation continued,
Welch mentioned another storage facility might have a 10 x 20 foot unit
available.  Ultimately, Welch recommended Schaffer try Midtown because the prices,
deposits, and fees were less expensive.  Welch told Schaffer to ask for Tammy
and to tell Tammy AStacy sent [her].@

Based upon Schaffer=s conversation
with Welch, Getz decided to hire a private investigator to document Welch=s actions.  J.J.
Gradoni, the private investigator, called Welch and posed as a potential Space
Place customer.  According to Gradoni, Welch told him the rental units at
Midtown were Aquite a bit cheaper.@  Welch gave
Gradoni Midtown=s phone number, and told him to tell Tammy
AStacy sent [him].@  Gradoni then
called Midtown, and Tammy admitted to Gradoni that Stacy had previously
referred customers to her.








After learning Welch was diverting customers from Space
Place to Midtown, Getz became concerned Welch might also be disclosing Space
Place=s trade secrets. 
Getz printed off documents stored on the fax machine[2]
and discovered Welch sent confidential information to Midtown while she was
still serving as manager of Space Place=s facility.  The
documents Welch sent were Space Place=s daily rental
logs for the months of May 2005 through November 2005.  The daily rental logs
contained the names of Space Place=s tenants, the
dates the rental contracts commenced, the terms of the rental obligations, the
number and size of the units rented, and the employee who handled the
transactions.  According to Getz, this confidential information would provide a
competitor, such as Midtown, an advantage because it could market directly to
Space Place=s current customers and provide slightly cheaper
rates.  Getz also discovered someone at Midtown, on more than one occasion,
sent Welch a list of Midtown=s available units.  According to Getz, if
Midtown was attempting to divert business from Space Place, such a list would
be useful in determining whether Midtown could accommodate the needs of Space
Place=s current and
prospective tenants.








Additionally, Getz discovered that at some point in
November, Welch met with certain Midtown employees and provided confidential
information regarding Catholic Charities, one of Space Place=s largest
customers.  Based on the information provided by Welch, Midtown prepared a
proposal for Catholic Charities, and sent the proposal in an attempt to
persuade Catholic Charities to switch its business to Midtown.  The proposal
stated A[i]f any additional
information is needed, please contact Stacy or [Troy Sheppard].@  The AStacy@ referred to in
the letter was Welch.  At the time Midtown prepared the proposal, it knew Welch
was still working as the manager of Space Place=s facility.  After
Catholic Charities received the proposal, Welch and certain Midtown employees
held a meeting with a representative from Catholic Charities, again attempting
to persuade it to switch its business.  Welch attended the meeting as a
representative for Midtown despite still being employed with Space Place.  On
November, 28, 2005, two days before Welch quit working for Space Place, she
sent another letter to Catholic Charities, again offering it incentives to
switch its business.  The letter had Midtown=s name, phone
number, and address on it, and it was signed by Welch.  According to Getz,
Welch, while still a manager for Space Place, also assisted Midtown in drafting
a letter to JB&A Aviation, Inc., another Space Place customer.

As a consequence of these actions, both Anna Rasmussen and
JB&A Aviation stopped doing business with Space Place and transferred their
business to Midtown.  Based on Getz=s experience, the
average tenancy of customers at facilities similar to Space Place is
approximately 2.3 years.  According to Getz, there was no reason to believe
Rasmussen and JB&A Aviation would have left Space Place but for Welch=s actions. 
Rasmussen had been paying Space Place $99 per month and JB&A Aviation had
been paying $345 per month.  Space Place lost these customers and their monthly
rental payments.

Furthermore, according to the daily rental logs for the
month of November 2005, Welch signed up four new tenants the first four days of
the month; however, she did not make a single sale after November 4.  Coincidentally,
on or about November 4, Welch met with Dames, and Dames offered Welch a job and
a sign-on bonus to work as a manager of Midtown.  At some point after this
meeting, Welch began diverting business to Midtown, and in Getz=s opinion, based
on a historical analysis of Space Place=s business, Welch=s efforts to
divert business cost Space Place at least six customers it would have had
otherwise.








In December 2005, Space Place filed suit against both Welch
and Midtown.  As to Welch, Space Place alleged breach of contract; breach of
fiduciary duty; theft, misappropriation, and/or misuse of confidential
information and/or trade secrets; unjust enrichment; tortious interference with
contractual relationships; tortious interference with prospective business
relationships; and conspiracy.  As to Midtown, Space Place alleged theft,
misappropriation, and/or misuse of confidential information and/or trade
secrets; unjust enrichment; tortious interference with contractual
relationships; tortious interference with prospective business relationships;
and conspiracy.[3] 
In September 2006, Midtown and Welch each filed a no-evidence motion for
summary judgment.  The two motions were the same in all respects except Welch=s motion addressed
the two additional causes of action for breach of contract and breach of
fiduciary duty.  Space Place filed one response to the two motions and argued
evidence existed to support each element of each cause of action.  Ultimately,
the trial court denied Welch=s motion but granted Midtown=s motion.  Space
Place sought a severance as to the causes of action against Midtown, which the
trial court granted.  Space Place also nonsuited Welch.  This appeal followed. 

Discussion

A.      Did the
Trial Court Err in Granting Midtown=s No-Evidence
Motion for Summary Judgment?

In its first issue, Space Place argues the trial court
erred in granting Midtown=s no-evidence motion for summary judgment
because Space Place presented more than a scintilla of evidence on each
challenged element of each cause of action.  More specifically, Space Place
argues it presented evidence to support each element of theft,
misappropriation, and/or misuse of confidential information and/or trade
secrets; unjust enrichment; tortious interference with contractual
relationships; tortious interference with prospective business relationships;
and conspiracy.

1.       Standard
of Review








We review the granting of summary judgment de novo.
Cruikshank v. Consumer Direct Mortg., Inc., 138 S.W.3d 497, 500 (Tex. App.CHouston [14th
Dist.] 2004, pet. denied).  We may affirm a summary judgment only on grounds specifically
stated in the motion.  Id.  Where, as here, the trial court's order
granting summary judgment does not specify on what grounds it was granted, it
must be affirmed if any of the grounds asserted are meritorious. W. Invs.,
Inc. v. Urena, 162 S.W.3d 547, 550 (Tex. 2005).

In a no-evidence motion for summary judgment,
the movant must specifically state the elements as to which there is no evidence. 
Walker v. Thomasson Lumber Co., 203 S.W.3d 470, 473B474 (Tex. App.CHouston [14th
Dist.] 2006, no pet.).  The trial court must grant the motion unless the
respondent produces summary judgment evidence raising a genuine issue of
material fact.  Tex. R. Civ. P. 166a(i).  However, the respondent is A>not required to
marshal its proof; its response need only point out evidence that raises a fact
issue on the challenged elements.=@ Hamilton v.
Wilson, - - S.W.3d - -, No. 07-0164, 2008 WL 820717, *1 (Tex. March 28,
2008) (quoting Tex. R. Civ. P. 166a cmt.)).  








A no-evidence
summary judgment is essentially a pretrial directed verdict, and we apply the
same legal sufficiency standard in reviewing a no-evidence summary judgment as
we apply in reviewing a directed verdict.  Mathis v. Restoration Builders,
Inc., 231 S.W.3d 47, 50 (Tex. App.CHouston [14th
Dist.] 2007, no pet.).  We review the entire record in the light most favorable
to the non-movant, indulging every reasonable inference, and resolving any
doubts against the motion.  City of Keller v. Wilson, 168 S.W.3d 802,
824 (Tex. 2005).  We sustain a no-evidence
summary judgment if (1) there is a
complete absence of proof of a vital fact, (2) rules of law or evidence bar the
court from giving weight to the only evidence offered to prove a vital fact,
(3) the evidence offered to prove a vital fact is no more than a scintilla, or
(4) the evidence conclusively establishes the opposite of a vital fact.  Walker,
203 S.W.3d at 474.  Less than a scintilla of evidence exists when the evidence
offered to prove a vital fact is so weak so as to do no more than create a mere
surmise or suspicion of its existence, and in legal effect is no evidence.  Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004).  More than a
scintilla of evidence exists when the evidence rises to a level that would
enable reasonable and fair-minded people to differ in their conclusions as to
the existence of the vital fact.  Id.

 

2.       Analysis

a.       Theft, Misappropriation, and/or Misuse of
Confidential Information and/or Trade Secrets

In Space Place=s petition, its first cause of action
against Midtown is broad enough to encompass both a statutory claim under the
Texas Theft Liability Act and a common law claim of misappropriation.  Midtown
did not file special exceptions requesting Space Place be more specific. 
Instead, Midtown=s motion for summary judgment addressed both a statutory
cause of action and a common law cause of action, and argued no evidence
existed for each element.  Therefore, we will address both causes of action and
determine whether Space Place produced sufficient summary judgment evidence to
survive Midtown=s motion.         Under a common law cause of action for
misappropriation of trade secrets, a plaintiff must prove the following
elements: (1) existence of a trade secret; (2) breach of a confidential
relationship or improper discovery of a trade secret; (3) use of the trade
secret; and (4) damages. Trilogy Software, v. Callidus Software, Inc.,
143 S.W.3d 452, 463 (Tex. App.CAustin 2004, pet. denied) (citing IBP,
Inc. v. Klumpe, 101 S.W.3d 461, 476 (Tex. App.CAmarillo 2001,
pet. denied)).  Use of a trade secret means commercial use, by which a person
seeks to profit from the use of the secret.  Atl. Richfield Co. v. Misty
Prods., Inc., 820 S.W.2d 414, 422 (Tex. App.CHouston [14th
Dist.] 1991, writ denied).








Under the Texas
Theft Liability Act, Atheft@ is defined as Aunlawfully
appropriating property or unlawfully obtaining services as described by Section
. . . 31.05 . . . [of the] Penal Code.@[4]  Tex. Civ. Prac.
& Rem. Code Ann. ' 134.002(2) (Vernon 2005).  Section 31.05
of the Penal Code is titled ATheft of Trade Secrets,@ and states A[a] person commits
an offense if, without the owner=s effective
consent, he knowingly: (1) steals a trade secret; (2) makes a copy of an
article representing a trade secret; or (3) communicates or transmits a trade
secret.@  Tex. Penal Code
Ann. ' 31.05(b) (Vernon
2003).       

The daily rental
logs Welch sent to Midtown are the only potential trade secrets involved in
this case.  Space Place presented evidence these daily rental logs contained
the names of Space Place=s tenants, the dates the rental contracts
commenced, the terms of the rental obligations, the number and size of the
units rented, and the employee who handled the transactions.  Accordingly, we
must determine whether Space Place produced sufficient summary judgment
evidence to create a fact issue on whether the daily rental logs constitute
trade secrets.[5]








A trade secret is
any formula, pattern, device, or compilation of information which is used in
one=s business and
presents an opportunity to obtain an advantage over competitors who do not know
or use it.[6] 
Sharma v. Vinmar Int=l, Ltd., 231 S.W.3d 405,
424 (Tex. App.CHouston [14th Dist.] 2007, no pet.).  Customer lists,
pricing information, client information, customer preferences, buyer contacts,
blueprints, market strategies, and drawings have all been recognized as trade
secrets.  Id.  ASecret@ implies the
information is not generally known or readily available.  Id.  However,
the mere fact that knowledge of a product or process may be acquired through
inspection, experimentation, and analysis does not preclude protection from
those who would secure that knowledge by unfair means.  Id.  In Texas,
courts condemn the employment of improper means to procure trade secrets.  Id. 
The question is not AHow could he have secured the knowledge?@ but AHow did he?@  Id.  A
person is liable for disclosure or use of a trade secret if he either (1)
discovers the secret by improper means; or (2) his disclosure and use, after
properly acquiring knowledge of the secret, constitutes a breach of the
confidence reposed in him.  Id.  

To determine
whether information constitutes a trade secret, a court applies the following
six factors:

(1)     the extent to which the information is known
outside the claimant's business;

          (2)     the
extent to which the information is known by employees and others involved in
the claimant's business;

          (3)     the
extent of the measures taken by the claimant to guard the secrecy of the
information;

          (4)     the
value of the information to the claimant and to its competitors;

          (5)     the
amount of effort or money expended by the claimant in developing the
information; and

          (6)     the
ease or difficulty with which the information could be properly acquired or
duplicated by others.

Id.  The party
claiming the trade secret need not satisfy all six factors because trade
secrets do not fit neatly into each factor every time.  Id. at 425.  The
status of the information claimed as a trade secret must be determined through
a comparative evaluation of all the relevant factors, including the value,
secrecy, and definiteness of the information as well as the nature of the
defendant=s misconduct.  Id.  








When viewed in the
light most favorable to the non-movant, as we must, the evidence supports four
of the six factors.  Evidence existed that the information contained in the
daily rental logs was not known outside of Space Place=s business. 
According to Getz, the physical copies of the daily rental logs were kept
inside a filing cabinet, which was not accessible to the public.  Getz
considered the information contained in the daily rental logs to be proprietary
and confidential.  There was no publicly available way to ascertain the
customers= names contained in these documents.  Additionally,
this information was known by Welch based on her agreement to keep it
confidential.  There was also evidence Space Place made an effort to keep this
information secret.  As stated, Space Place kept the daily rental logs in a filing
cabinet not accessible to the public.  Additionally, Space Place provided Welch
a code so she could access the confidential information on the computer, and it
required Welch to sign an employment contract in which she agreed to keep all
information regarding the facility and its tenants in Astrict confidence.@  Space Place also
presented evidence regarding the value of the information.  According to Getz,
the information contained in the daily rental logs would allow competitors,
such as Midtown, to directly market to a specific set of customers with obvious
self-storage needs.  The information would allow competitors to slightly
undercut Space Place=s prices and take its business.  In fact,
Dames, a manager of Midtown, admitted this was not the type of information he
would want his competitor to know.  Accordingly, we conclude Space Place
presented more than a scintilla of evidence to create a genuine issue of
material fact as to whether the daily rental logs, which Welch sent to Midtown,
constitute trade secrets.








Next, Space Place
argues evidence exists to support the remaining elements of both a statutory
claim and a common law claim of misappropriation.  We agree.  Space Place
presented evidence that Midtown improperly acquired Space Place=s trade secrets
through the actions of Welch, who violated her contractual and common law[7]
duties to Space Place.  Space Place presented evidence Midtown sent Welch, via
fax, Midtown=s vacancy reports on more than one occasion.  In
addition, Welch sent Midtown Space Place=s daily rental
logs, which contained Space Place=s trade secrets. 
According to Getz, Midtown=s vacancy reports would be useful for
Welch to determine whether Midtown could accommodate the needs of Space Place=s current and
prospective customers, and Space Place=s trade secrets
would be useful in allowing Midtown to directly market to Space Place=s customers.  From
this evidence, a fact finder could reasonably infer Midtown sent Welch its
vacancy reports in an effort to elicit Space Place=s trade secrets.

Space Place also
presented evidence Midtown used Space Place=s trade secrets
for commercial use.  Midtown, with the help of Welch, contacted at least two of
Space Place=s customers and tried to persuade them to switch their
business from Space Place to Midtown.  Midtown offered Space Place=s customers
cheaper prices than they were paying at Space Place and incentives to switch
their business.  Midtown used Space Place=s information in
an effort to persuade Space Place customers to become customers of Midtown,
enabling Midtown to enhance its profit.  








There is also
evidence of damages resulting from Welch and Midtown=s actions.  Two of
Space Place=s customers, Rasmussen and JB&A Aviation,
transferred their business to Midtown, and according to Getz, there was no
reason to believe they would have left but for these actions.  Based on Getz=s experience, the
average tenancy of customers at facilities similar to Space Place is
approximately 2.3 years.  Rasmussen had been paying Space Place $99 per month
and JB&A Aviation had been paying $345 per month.  Space Place lost these
customers and their monthly rental payments.  Additionally, Space Place lost
the value of its confidential information.  We conclude Space Place presented
more than a scintilla of evidence on each element to create a genuine issue of
material fact as to whether Midtown misappropriated Space Place=s trade secrets
under either the Texas Theft Liability Act or the common law.[8] 
Therefore, the trial court erred in granting summary judgment on these causes
of action.

 

b.       Unjust Enrichment

A party may
recover under the unjust enrichment theory when one person has obtained a
benefit from another by fraud, duress, or the taking of an undue advantage.  Heldenfels
Bros., Inc. v. City of Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992). 
Unjust enrichment is an equitable principle holding that one who receives
benefits unjustly should make restitution for those benefits.  Villarreal v.
Grant Geophysical, Inc., 136 S.W.3d 265, 270 (Tex. App.CSan Antonio 2004,
pet. denied).  Unjust enrichment occurs when the A>person sought to
be charged [has] wrongfully secured a benefit or [has] passively received one
which it would [be] unconscionable to retain.=@ Id.
(quoting City of Corpus v. S.S. Smith & Sons Masonry, Inc., 736
S.W.2d 247, 250 (Tex. App.CCorpus Christi 1987, writ denied)).

Midtown=s motion for
summary judgment alleges Space Place failed to produce evidence that Midtown
obtained a benefit from the taking of an undue advantage because no evidence
exists to prove (1) the alleged information was confidential; (2) Midtown
unlawfully appropriated any alleged confidential information; (3) Midtown
intentionally or wrongfully used confidential information; and (4) damages. 
However, based on the analysis above regarding misappropriation, we conclude
Space Place produced more than a scintilla of evidence to prove Midtown wrongly
secured a benefit by improperly obtaining Space Place=s trade secrets. 
We conclude Space Place created a genuine issue of material fact as to whether Midtown
was unjustly enriched.  Therefore, the trial court erred in granting summary
judgment on this cause of action.  








c.       Tortious Interference with Contractual
Relationships

The elements of
tortious interference with contractual relationships are: (1) the existence of
a contract subject to interference; (2) the occurrence of an act of
interference that was willful and intentional; (3) the act was a proximate
cause of the claimant=s damage; and (4) actual damage or loss
occurred.  Baty v. Protech Ins. Agency, 63 S.W.3d 841, 856B57 (Tex. App.CHouston [14th
Dist.] 2001, pet. denied).  Midtown=s motion for
summary judgment alleged Space Place failed to produce evidence of each
element.

In response, Space
Place produced evidence Midtown interfered with Space Place=s customers= contracts.  As
evidence of the first element, Space Place provided evidence three of its
customers, JB&A Aviation, Rasmussen, and Catholic Charities, had valid
contracts with Space Place.  Space Place also produced evidence of the
remaining three elements.  As explained in detail above, Space Place provided
evidence Midtown improperly misappropriated Space Place=s daily rental
logs, which contained these three customers= names and their
information regarding rental space and price.  Subsequently, Midtown, with the
help of Welch while she was still a manager of Space Place, contacted Space
Place customers in an attempt to persuade them to switch their business from
Space Place to Midtown.  As a result, JB&A Aviation and Rasmussen switched
their business to Midtown. The loss of these customers caused Space Place
actual damages in the form of lost rental payments.








In addition to
evidence Midtown interfered with Space Place=s customers= contracts, Space
Place also presented evidence Midtown interfered with Welch=s employment
contract with Space Place.  While Welch was serving as manager for Space Place,
Dames met with Welch, offered her a position as a manager of Midtown, and
offered her a sign-on bonus.  According to Getz, providing sign-on bonuses is a
practice virtually unheard of in the storage-facility industry.  Welch accepted
the position with Midtown, but continued working at Space Place for the rest of
November.  However, after Welch=s meeting with Dames, Welch began
diverting customers from Space Place to Midtown and acting as a representative
of Midtown.  Midtown was aware of Welch=s actions.  In
fact, Welch and certain Midtown employees held meetings together in which Welch
provided confidential information.  They also met with Space Place customers
together acting as agents of Midtown.  From this evidence, a fact finder could
reasonably infer Midtown willfully and intentionally interfered with Welch=s employment
contract which required her to keep facility and tenant information in Astrict confidence,@ required her to
keep the occupancy of Space Place high, and required her to motivate current
tenants to retain their storage units.  As a direct result of Midtown=s actions, Space
Place suffered damages in the form of lost customers and the loss of
confidential information.  

We conclude Space
Place presented more than a scintilla of evidence on each element to create a
genuine issue of material fact as to whether Midtown tortiously interfered with
Space Place=s customers= contracts.  We
also conclude Space Place presented more than a scintilla of evidence on each
element to create a genuine issue of material fact as to whether Midtown
tortiously interfered with Welch=s employment
contract with Space Place.  Therefore, the trial court erred in granting
summary judgment on this cause of action.

d.       Tortious Interference with Prospective Business
Relationships

The elements of
tortious interference with a prospective business relationship are:  (1) a
reasonable probability the plaintiff would have entered into a business
relationship; (2) an independently tortious or unlawful act by the defendant
that prevented the relationship from occurring; (3) the defendant did such act with
a conscious desire to prevent the relationship from occurring or the defendant
knew the interference was certain or substantially certain to occur as a result
of the conduct; and (4) the plaintiff suffered actual harm or damages as a
result of the defendant=s interference.  Id. at 860. 
Midtown=s motion for
summary judgment alleged Space Place failed to produce evidence of each
element.








To support the
first element, Space Place relies on evidence Welch diverted phone calls from
Space Place to Midtown and evidence Space Place suffered a significant drop in
business during the month of November.  However, we conclude mere phone calls
from potential customers do not reach the level of a reasonable probability
that Space Place would have entered into a business relationship.  While it is
not necessary to prove the contract would have certainly been made but for the
interference, it must be reasonably probable, considering all the facts and
circumstances attendant to the transaction.  Milam v. The Nat=l Ins. Crime
Bureau, 989 S.W.2d 126, 132 (Tex. App.CSan Antonio 1999,
rule 53.7(f) motion overruled).  More than mere negotiations must have taken
place.  Id.  Space Place did not produce evidence of clients with which
it had even begun negotiating, but instead, only produced evidence Welch was
diverting phone calls of people inquiring about Space Place.  Additionally,
mere evidence of a drop in customers is not sufficient evidence to support this
element.  See id. (holding references to the number of clients per year
an attorney had generally represented in the past and evidence that almost no
one had retained him since the incident was not sufficient to support a
reasonable probability he would have entered into the contract but for the
interference).  We conclude Space Place did not produce any evidence of a
reasonable probability that it would have entered into a business
relationship.  Therefore, the trial court did not err in granting summary
judgment on this cause of action.    

e.       Conspiracy  








The elements of
civil conspiracy are (1) a combination of two or more persons; (2) the
objective to be accomplished is an unlawful purpose or a lawful purpose by
unlawful means; (3) a meeting of minds on the object or course of action; (4)
one or more unlawful, overt acts; and (5) damages as the proximate result.  Ins.
Co. of N. Am. v. Morris, 981 S.W.2d 667, 675 (Tex. 1998). Civil conspiracy
requires specific intent.  Triplex Commc=ns Inc. v. Riley, 900 S.W.2d 716,
719 (Tex. 1995).  For a civil conspiracy to arise, the parties must be aware of
the harm or wrongful conduct at the inception of the combination or agreement. 
Id.  Because liability depends on participation in some underlying tort,
conspiracy is considered a derivative tort.  Baty, 63 S.W.3d at 864
(citing Tilton v. Marshall, 925 S.W.2d 672, 681 (Tex. 1996)). 
Therefore, to prevail on a civil conspiracy claim, the plaintiff must show the
defendant was liable for some underlying tort.  Id. (citing Trammell
Crow Co. No. 60 v. Harkinson, 944 S.W.2d 631, 635 (Tex. 1997)).  Proof of a
civil conspiracy may be, and usually must be, made by circumstantial evidence,
but vital facts may not be proved by unreasonable inferences from other facts
and circumstances.  Schlumberger Well Surveying Corp. v. Nortex Oil &
Gas Corp., 435 S.W.2d 854, 858 (Tex. 1969).  

Space Place
brought claims against Midtown for conspiracy to misappropriate trade secrets,
tortiously interfere with contractual relationships, tortiously interfere with
prospective business relationships, and induce Welch to breach her fiduciary
duty.[9] 
Midtown=s motion for
summary judgment argued Space Place failed to produce summary judgment evidence
of each element of conspiracy for each underlying tort.

First, Space Place
produced evidence of a combination of two or more personsCnamely, Welch and
Midtown.[10] 
Next, we find the evidence produced by Space Place, which is recounted in
detail in the factual section above and in sections (A)(2)(a) and (A)(2)(c)
above, and the reasonable inferences which can be drawn from this evidence,
provide more than a scintilla of evidence to support the remaining elements of
a conspiracy  to misappropriate trade secrets and tortiously interfere with
contractual relationships.  However, because we determined the trial court
properly granted summary judgment on Space Place=s claim of
tortious interference with prospective business relationships, Midtown cannot
be held liable for conspiracy with respect to that cause of action.  See
Baty, 63 S.W.3d at 864 (stating conspiracy is a derivative tort).








Lastly, we must
determine whether Welch had a fiduciary duty to Space Place before we can
determine whether Midtown can be held liable for civil conspiracy to induce
Welch to  breach her fiduciary duty.  Space Place argues Welch=s managerial
position at Space Place gave rise to certain fiduciary duties, including the
duties of good faith, honesty, and loyalty.  Midtown argues Welch did not owe a
fiduciary duty to Space Place because there is no evidence Welch was an
employee of Space Place.  Instead, Midtown argues Welch was actually an
employee and agent of Gemcorp Co.[11] 
Midtown also contends less than a scintilla of evidence exists to prove Welch
ever held a position of trust and confidence with Space Place.  








The term Afiduciary@ generally applies
Ato any person who
occupies a position of peculiar confidence towards another,@ refers to Aintegrity and
fidelity,@ and contemplates Afair dealing and
good faith.@  Kinzbach Tool Co. v. Corbett-Wallace Corp.,
138 Tex. 565, 571, 160 S.W.2d 509, 512 (1942).  Texas courts have held certain
employees owe a fiduciary duty to their employers under an agent/principal
theory.  See Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 203
(Tex. 2002) (holding an associate at a law firm owes a fiduciary duty to his or
her employer not to personally profit or realize any financial or other gain or
advantage from referring a matter to another law firm or lawyer, absent the
employer=s agreement
otherwise); Daniel v. Falcon Interest Realty Corp., 190 S.W.3d 177, 184B87 (Tex. App.CHouston [1st
Dist.] 2005, no pet.) (holding the project manager and on-site superintendent
for a construction project was an agent and, therefore, owed his employer a
fiduciary duty); Abetter Trucking Co. v. Arizpe, 113 S.W.3d 503, 510B11 (Tex. App.CHouston [1st
Dist.] 2003, no pet.) (holding a key employee of a trucking company, who was in
charge of all field operations and was the principal person who interacted with
the drivers and clients, was an agent and, therefore, owed his employer a
fiduciary duty); Herider Farms-El Paso, Inc. v. Criswell, 519 S.W.2d
473, 477 (Tex. Civ. App.CEl Paso 1975, writ ref=d n.r.e.) (holding
a manger of a retail poultry and egg outlet occupied a position which gave rise
to the duties of a fiduciary).  In an agency relationship, such as
employer-employee, courts take all aspects of the relationship into
consideration when determining the nature of fiduciary duties flowing between
the parties.  Nat=l Plan Adm=rs, Inc. v. Nat=l Health Ins. Co., 235 S.W.3d 695,
700 (Tex. 2007).  

When a fiduciary
relationship of agency exists between employee and employer, the employee has a
duty to act primarily for the benefit of the employer in matters connected with
his agency.  Johnson, 73 S.W.3d at 200.  Among the agent=s fiduciary duties
to the principal is the duty to account for profits arising out of the
employment, the duty not to act as, or on account of, an adverse party without
the principal=s consent, the duty not to compete with the principal
on his own account or for another in matters relating to the subject matter of
the agency, and the duty to deal fairly with the principal in all transactions
between them.  Id.  If an agent, while employed by his principal, uses
his position to gain a business opportunity belonging to the employer, such
conduct constitutes an actionable wrong.  Abetter Trucking Co., 113
S.W.3d at 510.  








First, we must
address Midtown=s argument that Space Place failed to
provide evidence Welch was a Space Place employee.  Instead, Midtown argues
Welch was an employee of Gemcorp; therefore, she did not owe Space Place any
fiduciary duties.  Initially, we point out Midtown failed to raise this
no-evidence argument in its motion for summary judgment,[12]
so it has effectively waived this argument.  See Tex. R. Civ. P. 166a(i)
(stating the motion must state the elements as to which there is no evidence). 
Even if Midtown had properly preserved this issue, we conclude Space Place
presented more than a scintilla of evidence Welch was a Space Place employee. 
According to Getz, he established Gemcorp as a joint employment company so he
could provide his employees better benefits.  The evidence also demonstrates
while Getz admitted Gemcorp issued Welch payroll checks for a portion of her
compensation, Gemcorp billed Space Place for each payroll check, which Space
Place then reimbursed.  Additionally, the evidence shows Space Place directly
compensated Welch for her work by giving her free rent and utilities in an
apartment owned by Space Place.  The lease agreement for the apartment was made
between Space Place and Welch and was effective A[a]s long as
[Welch] remain[ed] employed at [Space Place].@  Welch admitted
in her affidavit and deposition she was employed by Space Place.  Also, the
employment contract Welch signed stated ASpace Place Self
Storage@ at the top of the
document.

Furthermore, even
if Welch was a general employee of Gemcorp, she might also be considered a
borrowed employee for Space Place.  The Texas Supreme Court has long recognized
a general or regular employee of one employer may become the borrowed employee
of another if such other employer or his agents have the right to direct and
control the details of the particular work.  See St. Joseph Hosp. v. Wolff,
94 S.W.3d 513, 537B38 (Tex. 2002).  If Welch is the employee
of Gemcorp, Space Place produced evidence it had the right to control and
direct the details of Welch=s work, making her a borrowed employee for
Space Place.  Accordingly, we conclude Space Place presented more than a
scintilla of evidence to create a genuine issue of material fact as to whether
Welch was a Space Place employee, or at the very least, a borrowed employee.








Next, we must
determine whether Welch occupied a position of confidence towards Space Place,
giving rise to certain fiduciary duties under an agent/principal theory.  Space
Place produced evidence it hired Welch as the on-site manager, which was the
most important day-to-day position at the facility.  According to Getz, the
manager was responsible for supervising all interactions with current and
prospective tenants and for marketing the facility.  The manager was in charge
of all daily financial transactions and had the authority to transact business
on behalf of Space Place without daily supervision.  Space Place provided the
manager access to all of its data regarding tenants, prospective tenants,
pricing, vendors, and marketing information.  Additionally, Welch stated in her
deposition she considered herself to be in a position of trust.  Based on this
information, we conclude Space Place produced more than a scintilla of evidence
to prove Welch held a position of confidence and trust as the manager. 
Therefore, Welch possessed a fiduciary relationship with Space Place.  See
Johnson, 73 S.W.3d at 203 (holding an associate at a law firm owes a
fiduciary duty to his or her employer not to personally profit or realize any
financial or other gain or advantage from referring a matter to another law
firm or lawyer, absent the employer=s agreement
otherwise); Daniel, 190 S.W.3d at 184B87 (holding the
project manager and on-site superintendent for a construction project owed his
employer a fiduciary duty); Abetter Trucking Co., 113 S.W.3d at 510B11 (holding a key
employee of a trucking company, who was in charge of all field operations and
was the principal person who interacted with the drivers and clients, owed his
employer a fiduciary duty); Criswell, 519 S.W.2d at 477 (holding a
manger of a retail poultry and egg outlet occupied a position which gave rise
to the duties of a fiduciary).  Welch owed Space Place the duties associated
with an agency, imposing on Welch the duty not to act as, or on account of, an
adverse party without the principal=s consent.[13] 
See Johnson, 73 S.W.3d at 200.          

Having determined
Space Place presented more than a scintilla of evidence to support the argument
Welch owed certain fiduciary duties to Space Place, we conclude the evidence
produced by Space Place, which is recounted in detail in the factual section above,
and the reasonable inferences which can be drawn from this evidence, provide
more than a scintilla of evidence to support the elements of a conspiracy to
induce Welch to breach her fiduciary duty.          

Accordingly, we
conclude Space Place presented more than a scintilla of evidence on each
element to create a genuine issue of material fact for conspiracy to
misappropriate, conspiracy to tortiously interfere with contractual
relationships, and conspiracy to induce Welch to breach her fiduciary duty. 
Therefore, the trial court erred in granting summary 

 








judgment on these
causes of action.  However, we conclude Space Place did not present at least a
scintilla of evidence on each element to create a genuine issue of material
fact for conspiracy to tortiously interfere with prospective business
relationships.  Therefore, the trial court did not err in granting summary
judgment on this cause of action.

B.      Did the Trial Court Err in Overruling Space Place=s Objections to
Midtown=s Summary Judgment Evidence?

In its second
issue, Space Place argues Midtown produced incompetent summary judgment
evidence, and the trial court erred in overruling Space Place=s objections to
the evidence.  More specifically, Space Place argues Midtown=s evidence was
conclusory, contained improper verifications, failed to show personal
knowledge, was unauthenticated, and was hearsay.

1.       Analysis

Midtown filed a
no-evidence motion for summary judgment but also attached evidence to its
motion.  However, the fact evidence may be attached to a no-evidence motion for
summary judgment does not mean the motion should be disregarded or treated as a
traditional motion.  See Binur v. Jacobo, 135 S.W.3d 646, 651 (Tex.
2004).  Thus, we still construe Midtown=s motion as a
no-evidence motion.  In a no-evidence motion for summary judgment, the non-movant
bears the burden of producing competent summary judgment evidence; therefore in
this case, Space Place bore the burden of producing proper summary judgment
evidence, not Midtown.  See Tex. R. Civ. P. 166a(i).  Pursuant to this
rule, we have not considered the evidence attached by Midtown in conjunction
with its motion.  See Southtex 66 Pipeline Co., Ltd. v. Spoor, 238
S.W.3d 538, 542 n.1 (Tex. App.CHouston [14th Dist.] pet. denied) (stating
even though the movant in a no-evidence summary judgment attached evidence, the
appellate court did not consider the evidence).  As a result, Space Place=s objections to
Midtown=s evidence were
irrelevant; therefore, we need not address Space Place=s second issue on
the merits.  See Tex. R. App. P. 47.1.  Appellant=s second issue is
overruled.  








Conclusion

We reverse the
judgment of the trial court granting Midtown=s summary judgment
motion as to Space Place=s causes of action for theft,
misappropriation, and/or misuse of confidential information and/or trade
secrets; unjust enrichment; tortious interference with contractual
relationships; and conspiracy to misappropriate, tortiously interfere with
contractual relationships, and induce the breach of a fiduciary duty.  We
remand these portions of the judgment to the trial court for further
proceedings consistent with this opinion.  We affirm the judgment of the trial
court granting Midtown=s summary judgment motion as to Space
Place=s causes of action
for tortious interference with prospective business relationships and
conspiracy to tortiously interfere with prospective business relationships.  

 

 

 

/s/      John S. Anderson

Justice

 

 

 

Judgment rendered
and Memorandum Opinion filed May 8, 2008.

Panel consists of
Chief Justice Hedges and Justices Anderson and Boyce.









[1]  The factual recitation is stated in the light most
favorable to the non-movant, indulging every reasonable inference, and
resolving any doubts against the motion.  City of Keller v. Wilson, 168
S.W.3d 802, 824 (Tex. 2005); Mathis v. Restoration Builders, Inc., 231
S.W.3d 47, 50 (Tex. App.CHouston [14th Dist.] 2007, no pet.).





[2]  Space Place=s
fax machine contained a memory function that permitted users to print out faxes
which previously had been sent or received.





[3]  These are the causes of action alleged against Welch
and Midtown in Space Place=s Second
Amended Petition.  Midtown alleges a Third Amended Petition exists; however,
the trial court certified to this court Plaintiff=s Third Amended Petition was not found in the trial court case file and
a document inquiry revealed it had not been filed with the trial court.  





[4]  The Texas Theft Liability Act provides a private
cause of action for many different forms of theft.  Theft of a trade secret, as
defined in section 31.05 of the Penal Code, is the only form of theft
applicable in this case.  See Tex. Civ. Prac. & Rem. Code Ann. ' 134.002(2) (Vernon 2005); Tex. Penal Code Ann. ' 31.05 (Vernon 2003).





[5]  In its brief, Space Place argues the common law tort
of misappropriation does not solely depend on the existence of a trade secret. 
Essentially, Space Place argues a claim of misappropriation of confidential
information can survive even if the information does not constitute a trade
secret.  We disagree.  There is no cause of action for misappropriation of
confidential information that is not either secret, or at least substantially
secret.  Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc., 879
S.W.2d 89, 99 (Tex. App.CHouston [14th Dist.] 1994, writ denied). 





[6]  Under the Texas Theft Liability Act, Atrade secret@ is
defined as Athe whole or any part of any scientific or technical
information, design, process, procedure, formula, or improvement that has value
and that the owner has taken measures to prevent from becoming available to
persons other than those selected by the owner to have access for limited
purposes.@  Tex. Penal Code Ann. ' 31.05(a)(4) (Vernon 2003); See Tex. Civ. Prac. & Rem. Code
Ann. ' 134.002(2) (incorporating definitions from the Penal
Code).  We conclude
the statutory definition
of trade secret is consistent with
the common law definition; therefore we will conduct only one analysis.  See
Klumpe, 101 S.W.3d at 472 (AThe statutory definition of trade secret comports with the definition
used when tort and contract trade secret law is considered.@).  





[7]  Apart from any written contract, an employee owes a
duty to his employer to refrain from using confidential information acquired during the employment relationship in a
manner adverse to the employer, even after the employee has been terminated.  T-N-T
Motorsports, Inc. v. Hennessee Motorsports, Inc., 965 S.W.2d 18, 21B22 (Tex. App.CHouston [1st Dist.] 1998, pet. dism=d).





[8]  While we recognize the elements of a statutory claim
and a common law claim of misappropriation are not exactly the same, we
conclude the same evidence supports both causes of action.  Under a statutory
claim, A[a] person commits an offense if,
without the owner=s effective consent, he knowingly:
(1) steals a trade secret.@  Tex. Penal Code Ann. ' 31.05(b)(1); see Tex. Civ. Prac. & Rem. Code Ann. ' 134.002(2).  ASteals@ is defined as A[acquiring]
property or services by theft,@ and Atheft@ is defined as Aunlawfully [appropriating] property with intent to
deprive the owner of property.@  Tex. Penal
Code Ann. '' 31.01(7), 31.03(a) (Vernon 2003).  We find Space
Place=s evidence, explained in detail in this section,
supports a reasonable inference that Midtown knowingly stole Space Place=s trade secrets, as defined in the Penal Code.  See
id. '' 31.01(7), 31.03(a)B(b),
31.05(b)(1); Tex. Civ. Prac & Rem. Code Ann. ' 134.002(2).





[9]  It is settled as the law of this State  where a
third party knowingly participates in the breach of duty of a fiduciary, such
third party becomes a joint tortfeasor with the fiduciary and is liable as
such.  Baty, 63 S.W.3d at 863.





[10]  In oral argument, Midtown tried to argue because Space Place had
nonsuited Welch, there was no evidence of
a combination of two or more persons.  We disagree.  The first element of a
civil conspiracy does not require proof of a combination of two or more Aparties to the lawsuit,@ but rather, proof of a combination of two or more Apersons.@ 
Welch and Midtown are Apersons@
for purposes of this cause of action; therefore, it is irrelevant that Midtown
nonsuited Welch.  





[11]  Gemcorp Co. is a company established by Getz for the
purpose of providing his employees a various self-storage locations health
insurance and other benefits.  





[12]  Welch raised this argument in her motion for summary
judgment, but because Welch is not a party to this appeal, we cannot consider
her motion.  Midtown=s motion for summary judgment stated APlaintiff has failed to produce competent evidence as
to the origin of Ms. Welch=s fiduciary
duties,@ but we do no find this language sufficient to
preserve this claim.





[13]  In Midtown=s
Supplemental Brief on Fiduciary Duty, Midtown admits A[i]f Ms. Welch were the employee of [Space Place] she
may owe them a fiduciary duty.@