

# NUMBER 13-10-00173-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI—EDINBURG

---

IASIS HEALTHCARE CORPORATION,                  **Appellant,**

**v.**

APOLLO PHYSICIANS OF TEXAS, P.A.,                **Appellee.**

---

## On appeal from the 58th District Court
## of Jefferson County, Texas

---

# MEMORANDUM OPINION

### Before Justices Vela, Perkes, and Hill[1]
### Memorandum Opinion by Justice Hill

---

[1] Retired Second Court of Appeals Justice John Hill assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code. *See* TEX. GOV'T CODE ANN. § 74.003 (West 2005).

IASIS Healthcare Corporation ("IASIS") appeals from a judgment in favor of Apollo Physicians of Texas, P.A., ("Apollo") following a trial to a jury. Based upon findings by the jury, the trial court entered a judgment in favor of Apollo in the amount of $9,981,581.90 in actual damages, taking into account a credit of $18,418.10; plus prejudgment interest on a portion of the damages in the amount of $571,056.69; plus costs of court. IASIS urges in five issues that: (1) the evidence is legally and factually insufficient to support the jury's findings that IASIS tortiously interfered with Apollo's prospective contractual or business relationship with the doctors employed by Apollo; (2) the evidence conclusively established that IASIS acted in good faith; (3) the evidence is legally and factually insufficient to support the jury's lost profit findings; (4) the trial court committed reversible error by failing to identify any alleged independent tort or unlawful act committed by IASIS that would support Apollo's cause of action for tortious interference with a prospective contractual or business relationship in Question Number 2 of the jury charge; and (5) the trial court reversibly erred by admitting racially-charged evidence that was irrelevant and prejudicial. We reverse the judgment and render judgment that Apollo take nothing by its suit.

IASIS contends in issue one that the evidence is legally and factually insufficient to support the jury's finding in Question Number 2 that IASIS tortiously interfered with Apollo's prospective contractual or business relationship with Drs. Kolcun, Rainey, Marrero, and Foutz, employees of Apollo. In a challenge to the legal sufficiency of the evidence regarding an issue on which the appellant did not have the burden of proof, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors

could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We will sustain a no-evidence challenge if:

(a) there is a complete absence of evidence of a vital fact,

(b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact,

(c) the evidence offered to prove a vital fact is no more than a mere scintilla, or

(d) the evidence conclusively establishes the opposite of the vital fact.

*Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (citing Robert W. Calvert, "*No Evidence" and "Insufficient Evidence' Points of Error*, 38 TEX. L. REV. 361, 362-53 (1960). In a factual sufficiency review, we consider and weigh all the evidence, and will set aside the verdict only if the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

In order to establish liability for interference with a prospective contractual or business relation, the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful. *Wal-Mart v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). Conduct that is "independently tortious" is conduct that would violate some other recognized tort duty. *Id.*

Dr. Kirk Williams formed Apollo and assembled a group of physicians to provide emergency room services in two Port Arthur hospitals. IASIS subsequently purchased the two hospitals and merged them into The Medical Center of Southeast Texas. In December, 2006, after a period of on-going negotiations for a new contract, IASIS terminated Apollo's contract with the Medical Center. The Medical Center replaced Apollo

3

with EDCare, Apollo's competitor.  EDCare hired the physicians who had been working for Apollo to staff the emergency room at the Medical Center.

Apollo urges that the evidence shows that IASIS's conduct was independently tortious or unlawful because IASIS misappropriated Apollo's confidential information; violated federal and state law against patient dumping; and engaged in the corporate practice of medicine, in violation of the Medical Practice Act.  *See* TEX. OCC. CODE ANN. § 151.001 (West 2004), § 155.003 (West Supp. 2010), § 157.001 (West 2004), § 164.052(8) (West Supp. 2010), § 165.156 (West 2004).

We will first examine Apollo's contention that the evidence shows that IASIS's conduct was independently tortious or unlawful because it misappropriated Apollo's confidential information.  Prior to its termination of Apollo's contract with the Medical Center, IASIS required Apollo to submit to an audit by Jeff Lutz, with Deloitte & Touche. Apollo was concerned about revealing its proprietary information, such as payor mix, accounts receivable balance, assets of the corporation, profitability, and overhead, but the agreement with Deloitte & Touche had a confidentiality provision.  Soon after IASIS announced that it was terminating its contract with Apollo, but before the effective date of the termination, IASIS provided a copy of the audit report, which included information about Apollo's profitability, overhead, and payor mix to EdCare, Apollo's successor.

IASIS argues that Texas law does not recognize a cause of action for misappropriation of confidential information.  It relies upon the case of *Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc.,* 879 S.W.2d 89, 99 (Tex. App.—Houston [14th Dist.] 1994, writ denied).  As IASIS subsequently acknowledges, however, what the court

4

held in *Stewart and Stevenson* was that there is no cause of action for misappropriation of confidential information that is not either secret or substantially secret. *Id.*

IASIS contends that the information it disclosed to EDCare did not meet the test for trade secrets found in the Texas Supreme Court's opinion in *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (orig. proceeding). To determine whether a trade secret exists, we apply the Restatement of Tort's six-factor test: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of the measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See id.* (*citing* RESTATEMENT OF TORTS § 757 cmt. b. (1939); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 reporter's note cmt. d. (1995)). The party claiming a trade secret should not be required to satisfy all six factors because trade secrets do not fit neatly into each factor every time. *Id.* at 740. It is not possible to state precise criteria for determining the existence of a trade secret. *Id.* at 739. The status of information claimed as a trade secret must be ascertained through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information, as well as the nature of the defendant's misconduct. *Id.*

Because the audit was required by IASIS, the confidential information disclosed by Apollo was not disclosed voluntarily. The requirement of an audit was unusual. As previously noted, the contract between Apollo and Deloitte & Touche contained a

5

confidentiality provision. Considering the factors set forth in *In re Bass*, we hold that Apollo's confidential information does qualify as a trade secret. *Id.*

IASIS argues that Apollo provided the information to Deloitte & Touche without claiming the information was a trade secret, nor did it request that Deloitte treat it as such. We believe that the jury could reasonably have determined that Apollo's failure to call for nondisclosure of what it considered to be its secret information was on account of the confidentiality agreement between Apollo and Deloitte & Touche. IASIS also refers us to its argument that when meeting with Jeff Schillinger, the president of EDCare, the doctors discussed the same information with him over the course of several weeks, beginning with a meeting on December 12, 2006. We have examined IASIS's references to the record and find, with the exception of a discussion of whether the doctors had a non-competition agreement with Apollo, no evidence that the substance of the confidential material was disclosed by the Apollo physicians, either prior to, or after, IASIS provided EDCare with Apollo's confidential information. We conclude that IASIS's conduct in disclosing Apollo's confidential information to EDCare was independently tortious or unlawful.

IASIS urges that there is no evidence that any physician ceased working for Apollo and went to work for EDCare because of IASIS's alleged conduct. Because of IASIS's conduct, EDCare was in possession of Apollo's confidential information as to its business at the time it was negotiating with Apollo's physicians to leave Apollo and join EDCare. We believe that the jury could reasonably infer that EDCare used that information to assist in its successful bid to persuade those physicians to leave Apollo and join EDCare.

IASIS contends that the evidence conclusively establishes that Dr. Williams himself encouraged the physicians to work for EDCare and that he and Apollo resumed their

working relationship with the physicians at Promise Hospital four months after Apollo's contract with the Medical Center was terminated. The record reflects that after losing the contract at the Medical Center, Dr. Williams told the Apollo physicians something like, "[y]ou have to feed your families. So, do what you have to do and work for EDCare. And if I have an opportunity, we'll try to all get back together." Dr. Williams's comments to Apollo's physicians does not preclude a jury finding that IASIS tortiously interfered with Apollo's contractual relationships with them. The jury could have reasonably concluded that Williams's comment was made, not for the purpose of encouraging the physicians to leave Apollo to work for EDCare, but to show his compassion and to cement his relationship with them for the future.

While the evidence was sufficient to show that IASIS's conduct was independently tortious, it was not sufficient to show that it interfered with a prospective contractual or business relation. It could not have interfered with respect to Apollo's contract with IASIS, because IASIS had announced the termination of that contract the day prior to IASIS's disclosure of the confidential information to EDCare. The evidence does not disclose that there was any other contract that was interfered with by the disclosure. The evidence does show that, a short time later, the physicians were under contract with Apollo at another medical facility. Apollo asserts in its brief that losing the emergency room physicians meant that Dr. Williams was not able to obtain another contract for emergency care. However, the testimony to which Apollo refers does not support this assertion.

We next consider Apollo's claim that IASIS's conduct was independently tortious because it violated federal and state law against patient dumping. The Emergency Medical Treatment and Labor Act provides that a hospital must (1) provide appropriate

7

medical screening to establish if an emergency medical condition exists and (2) treat or stabilize the patient prior to transfer or discharge when an emergency condition is detected. 42 U.S.C. §1395dd (West 2006). We have been referred to no evidence showing that the Medical Center did not provide appropriate medical screening to establish if an emergency medical condition existed or that it failed to treat or stabilize any patient prior to transfer or discharge when an emergency condition was detected.

In urging that the evidence is sufficient, Apollo refers us to the testimony of Ashley Koenig, former chief nursing officer at Mid-Jefferson Hospital and surgery director at the Medical Center. She indicated that she was concerned when she went to a seminar in 2004 at IASIS's corporate headquarters that dealt with medical screen-out. She said the message she got from the seminar was that the medical screen-out procedure was to be implemented at the hospital immediately. She said it involved consideration both of the seriousness of the patient's condition and the patient's ability to pay. According to Koenig, after the medical screen-out seminar, both at Mid-Jefferson Hospital and at the Medical Center, emergency patients were to produce both a driver's license and insurance card prior to seeing a doctor. She related that financial clerks went from bed to bed of those without insurance, expecting each to pay $100-$200. She did not relate any instance in which this collection resulted in non-treatment or delay of treatment. Rather, she testified that, "the patients were still being cared for." Without any elaboration, Koenig indicated that there had been a violation or claim presented with respect to the Emergency Medical Treatment and Labor Act, 42 U.S.C. §1395dd.

This Act does not prohibit a hospital from obtaining insurance information at the time of emergency room admission, as long as the inquiry about insurance information

8

does not delay screening or treatment. *See Parker v. Salina Reg'l Health Ctr., Inc.,* 463 F. Supp. 2d 1263, 1267–69 (D. Kan. 2006); *Burton v. William Beaumont Hosp.*, 347 F. Supp. 2d 486, 495–96 (E.D. Mich. 2004). Both Koenig and the attorney for IASIS characterized that practice as being in violation of federal law. Given her apparent misunderstanding as to what would constitute a violation under the Act, we hold that Koenig's testimony that there had been a violation or claim under the Act at the Medical Center constituted no more than a scintilla of evidence to support a conclusion that the Medical Center was in violation of the Emergency Medical Treatment and Labor Act. We conclude that the evidence was legally and factually insufficient to support any implied finding that IASIS's conduct was independently tortious because it was in violation of the Act.

We next consider Apollo's claim that IASIS's conduct was independently tortious because a proposed contract presented to Apollo required its physicians to comply with certain corporate benchmarks, constituting an attempt to substitute IASIS's judgment for the independent medical judgment of the emergency room physicians. It contends that the proposed contract violates the Medical Practice Act, citing the Texas Occupational Code sections 151.001, 155.003, 157.001, 164.052(8), and 165.156. As we understand, the benchmarks to which Apollo refers are those contained in exhibit B of a draft agreement of November 29, 2006. They include the following provisions:

> Physician group will comply and adhere to the following corporate quality standards:
>
> a) Patients leaving against medical advice (AMA's) shall not exceed 1 percent.
>
> b) Patients leaving without treatment (LWOT's) shall be less than one percent of total emergency room visits.
>
> c) Patients are in a treatment room on an average of 15 minutes or less.

9

d) Average triage times less than 5 minutes.

e) Physician to patient average time of less than 30 minutes.

f) Average wait time in the emergency room from the time the patient enters the emergency department until the patient leaves the ED less than 2 hours.

As noted by Apollo in its brief, Dr. Williams testified that while these "benchmarks" were worthy goals, many of them dealt with areas that typically fall outside of a doctor's control, so that he was concerned that they would be used as the basis of a claim for breach of contract. We have not been directed to any evidence that indicated a concern that IASIS was attempting to place its judgment on medical matters ahead of the licensed physicians in the Medical Center emergency room. In its brief, Apollo does not elaborate on how these benchmarks constitute the practice of medicine on the part of IASIS, nor does it present any authority for such a suggestion. We sustain issue one. In view of our determination of this issue, we need not consider the remaining issues presented by IASIS in this appeal.

The judgment is reversed and judgment rendered that Apollo take nothing.


JOHN G. HILL
Justice


Delivered and filed the
20th day of October, 2011.